

David Slarskey
(646) 893-6082
767 Third Ave, 14th Fl
New York, NY 10017

May 29, 2026

BY ECF
The Honorable P. Kevin Castel
United States District Court Southern District of New York
500 Pearl Street, Courtroom 11D
New York, NY 10007

Re*:*   *Elsevier, Inc. et al. v. Meta Platforms, Inc. et al.*,
Case No. 1:26-cv-03689-PKC

Dear Judge Castel:

We are counsel for Proposed-Intervenor Dr. Kenneth Saladin ("Dr. Saladin") and seek to be named as counsel for a proposed textbook-author subclass (the "Proposed Subclass") in the above-captioned action. In accordance with Paragraph 3.A. of Your Honor's Individual Practices, we respectfully submit this request for Dr. Saladin to move to intervene individually and on behalf of the Proposed Subclass under 17 U.S.C. § 501(b), Rule 23(a)(2) of the Federal Rules of Civil Procedure and, in the alternative, under Rule 24(b).

Attached to this letter is Dr. Saladin's Proposed Complaint in Intervention ("Proposed Compl."), which sets forth his claims and the basis for subclass treatment, including for Dr. Saladin as a textbook-author subclass representative and for the undersigned as separate, independent counsel for the Proposed Subclass. An initial conference is scheduled in this case for July 27, 2026, at 11:30 A.M, or a later date at Your Honor's convenience (ECF No. 40).

## I.   Background and Interest

In this putative class action filed on May 5, 2026, Plaintiffs allege copyright and Digital Millennium Copyright Act violations arising from Meta Platforms, Inc. and Mark Zuckerberg's (collectively "Defendants") alleged unauthorized acquisition, reproduction, distribution, and use of copyrighted literary works to develop and train Meta's Llama generative AI models. (ECF No. 1). The operative complaint alleges that Meta, under Zuckerberg's direction, obtained books and journal articles via torrenting and unauthorized web-scraped datasets, then copied and improperly used those works for training across Llama model iterations.

The complaint defines and was brought on behalf of a putative class of legal or beneficial owners of registered copyrights allegedly reproduced, distributed, or otherwise used without authorization, with a class period beginning at least October 1, 2022, and running through the present. (*See* ECF No. 1 ¶¶ 167-174.) The pleading asserts that Defendants' copying occurred in multiple stages and affected a broad range of works, including educational textbooks and related materials. (*See, e.g., id.* ¶¶ 3 & n.1, 10, 50, 55, 126, 148, 155-156.)

This putative class includes both *authors* and *publishers*. In connection with any settlement or recovery, publishers and authors will be conflicted with respect to allocating the proceeds,

because damages are generally based on the work infringed, without regard to the relative rights of the stakeholders in that work (*i.e.*, the authors and publishers).

The named Plaintiffs, however, are all publishing companies, one trade author, and an entity that purportedly holds the rights of that trade author: Elsevier Inc., Cengage Learning, Inc., Hachette Book Group, Inc., Macmillan Publishing Group, LLC d/b/a Macmillan Publishers, McGraw Hill LLC, Scott Turow, and S.C.R.I.B.E., Inc.

And Plaintiffs are represented by law firms with longstanding relationships to publishing companies, which are conflicted in representing authors' interests against those publishers. (Proposed Complaint ¶¶ 101-103.)

Plaintiffs' cannot cure the obvious conflict, because authors are entitled to independent, unconflicted counsel in pursuing their interests and negotiating the adversarial issues between authors and publishers.

Dr. Saladin, a Georgia-based textbook author[1], seeks to intervene to protect the distinct interests of textbook authors who are members of the putative class. No textbook authors are among the named class representatives, notwithstanding the distinct position of those authors in relation to other members of the proposed class.

Textbook authors have discrete interests from others for the following reasons:

- Textbook authors operate in educational markets that differ materially from trade and scholarly markets, creating divergent interests and needs for proof on market harm, and damages. (Proposed Compl. ¶¶ 83-89.) Among other things, unlike other forms of publishing, textbook publishing extends beyond the work itself to associated products—study aids, solutions manuals, assessment questions, adaptive software, and online learning-platform materials—that will require distinct market-substitution and damages analyses. (*Id.* ¶¶ 53-58.)

- Textbook authors' legal and economic interests arise not just from Defendants' textual copying but also from Defendants' improper use of textbooks' pedagogical structure, sequencing, exposition, and educational presentation. Pursuing relief for the Proposed Subclass will accordingly require evidence and relief distinct from trade authors. (*Id.* ¶¶ 41, 53-58, 65).

- As contrasted with other types of works, textbook publishers often hold or assume exclusive rights and centralize registration, enforcement, and permissions, while textbook authors retain beneficial and revenue interests in their works. As a result, there are inherent intra-class conflicts over control, licensing, and allocation that undercut the adequacy of the named Plaintiffs and their counsel to represent and maximize the recoveries of members of the Proposed Subclass. (*Id.* ¶¶ 52, 62-64, 83-87.)

- Textbook publishing frequently involves multiple contributors across editions and formats and extensive supplemental materials (e.g., test banks, instructor manuals,

---

[1] Author of, *inter alia*, "Anatomy & Physiology: The Unity of Form and Function and Human Anatomy," "Essentials of Human Anatomy," and "Human Anatomy," all published by Plaintiff McGraw Hill.



online homework systems), likely requiring different damages models relative to other types of works. (*Id.* ¶¶ 48-49.)

- Textbook contracts frequently require assignment or transfer of copyright to publishers while reserving author royalty and participation rights, producing subclass-specific allocation and audit disputes distinct from other authors who generally do not assign their rights in the same manner. (*Id.* ¶¶ 87-103.)

As such, the existing plaintiffs cannot fairly and adequately represent textbook authors; not because the proposed class includes both authors and publishers, but because members of the Proposed Subclass presently lack a conflict-free proposed representative plaintiff and independent counsel to assure that their interests are fully and fairly considered. As discussed below, these adequacy concerns relate directly to Dr. Saladin's interest in ensuring the existence of a subclass structure, with appropriate counsel appointment, discovery priorities, and a settlement or recovery allocation that fairly accounts for textbook authors' distinct interests. Intervention and a textbook-author subclass are needed to ensure that textbook authors' interests are adequately represented, including with regard to market-substitution concerns, royalty structures, educational licensing practices, and author-publisher allocation issues. It is also required to provide for conflict-free counsel.

## II.    Argument

### a)    Intervention by Right Should be Granted

Here, Dr. Saladin and the Proposed Subclass meet the standard for intervention by right. 17 U.S.C. § 501(b) provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled…to institute an action for any infringement of that particular right committed while he or she is the owner of it…The court may require the joinder, and shall permit the intervention, of any person having or claiming an interest in the copyright."

Additionally, under Rule 24(a)(2), the court must permit intervention when the applicant: (1) timely files an application, (2) shows an interest in the action, (3) demonstrates that the interest may be impaired by the disposition of the action, and (4) shows that the interest is not protected adequately by the parties to the action. *Garcia v. Berkshire Nursery & Supply Corp.*, 705 F. Supp. 3d 188, 191 (S.D.N.Y. 2023). The movant's burden is minimal, and the test requires only a "show[ing] that the representation of h[is] interest may be inadequate." *Id.* at 193. This standard is particularly favorable when a class member seeks to intervene to represent a distinct subclass whose interests cannot be adequately advanced by the existing class representative. *See Chen-Oster v. Goldman, Sachs & Co.*, 2015 WL 4619663, at \*5 (S.D.N.Y. Aug. 3, 2015), *aff'd* 2016 WL 11645644 (S.D.N.Y. June 6, 2016) ("Indeed, it is common to permit intervention in a class action in order to cure some deficiency in the ability of the named plaintiffs to represent the class.").

*First*, the motion would be timely. The Complaint was filed on May 5, 2026, and Defendants are not scheduled to answer until July 13, 2026. (ECF Nos. 40-41.) No class has been certified, no class representative has been appointed, no class counsel has been appointed, no merits discovery has occurred, and no settlement has been presented for approval. Defendants will not be prejudiced by inclusion of Dr. Saladin and his representation of the textbook author subclass.



***Second***, Dr. Saladin and the subclass he represents have an interest in the action as textbook authors who have had their works pirated and used to train Defendants' AI technology, which is the subject of this litigation.

***Third***, the resolution of class action will (1) either bind Dr. Saladin and the textbook authors or (2) will require them to opt out and pursue their claims separately. Either outcome impairs Dr. Saladin and proposed class from pursuing their claims fairly and in a judicially efficient manner.

***Fourth***, Dr. Saladin and his fellow textbook authors' interests are not adequately protected here. The existing Plaintiffs do not adequately protect Dr. Saladin's interests because they include publisher plaintiffs, a trade-author plaintiff, and an entity associated with that trade author, but no named or proposed representative textbook-author plaintiff who will adequately represent textbook authors. The experience of textbook authors in the *Bartz v. Anthropic* litigation[2], a similar class action brought by authors whose works were pirated to train AI models, highlights this divergence of interests. (Proposed Compl. ¶¶ 66-103.)

In *Bartz*, when authors and publishers proceeded without a recognized textbook-author subclass, settlement and allocation structures emerged through mediation, which treated textbook authors differently and less favorably than trade and academic authors, including subjecting textbook authors to processes that favored publishers during claims administration. *Id*. There, the "Publishers' Coordinating Counsel" (including Plaintiffs' counsel here) participated in initial mediation and preliminary settlement efforts without separate textbook-author representation, and the proposed allocation lacked clarity on author-publisher splits, prompting judicial concern about behind-the-scenes arrangements disadvantaging textbook authors. (*Id*. ¶ 78.)

Textbook authors were belatedly invited to participate in later rounds of mediation (but not given a formal role in the litigation) and ultimately required by the settlement to navigate additional, complicated adversarial steps to establish their recoveries. The additional burden imposed upon textbook authors benefit the textbook publishers, fewer in number, better resourced, far more sophisticated to position themselves for a greater share of the recoveries. Unsatisfied with the structural advantage given them by the settlement, at least one major educational publisher then communicated inaccurate information to authors during the claims process, which threatened to depress author shares. This ultimately necessitated separate intervention efforts by the undersigned on behalf of TAA to obtain remedial action. (*Id*. ¶¶ 95-98.) In sum, the experience of textbook authors in the *Bartz* litigation demonstrates the need for subclass representation here.

Without intervention now, the existing Plaintiffs may pursue strategies, settlements, or narrowing of claims that inadequately protect textbook authors. Dr. Saladin accordingly seeks intervention now, before pleadings, discovery, class-certification strategy, Rule 23(g) appointments, or settlement architecture crystalize, to ensure that textbook authors' distinct interests are protected fully and fairly in this litigation.

### b)    Alternatively, Permissive Intervention Should Be Granted

Here, Dr. Saladin and the Proposed Subclass also meet the standard for permissive intervention. Rule 24(b) should be "construed liberally" in the class action context. *Clarkson v. Coughlin*, 145 F.R.D. 339, 343 (S.D.N.Y. 1993). Under Rule 24(b)(1)(B), the court may permit

---

[2] *Bartz v. Anthropic PBC*, No. 24-cv-05417 (N.D.Cal.)



4

anyone to intervene who "has a claim or defense that shares with the main action a common question of law or fact." *Chen-Oster*, 2015 WL 4619663, at \*5. A "claim or defense" is not "read in a technical sense but only require[s] some interest on the part of the applicant." *U.S. v. N.Y.C. Hous. Auth.*, 326 F.R.D. 411, 418 (S.D.N.Y. 2018). Courts also "must consider whether granting permissive intervention will unduly delay or prejudice the adjudication of the rights of the existing parties." *Id.* While Courts do consider the adequacy of representation under this test, it is a "clearly a minor factor at most" and the Court can grant intervention if it "will [merely] assist in the just and equitable adjudication of any of the may between the parties." *Id.*

Like Plaintiffs, Dr. Saladin's and the Proposed Class's claims arise from Meta's acquisition, reproduction, distribution, and AI-training use of copyrighted works in Llama and therefore presenting common legal and factual questions with the existing action (Proposed Compl. ¶¶ 20-24.) Intervention is timely and will not unduly delay or prejudice the parties because the case was just filed, Defendants have not appeared, and no schedule, discovery, or class-certification proceedings have commenced (*Id*. 109-110.) Moreover, permissive intervention will assist the Court by ensuring that textbook-author interests—distinct from publishers and trade authors—are fairly and adequately presented through subclass considerations, tailored proof of market harm, appropriate class governance at the outset, and the allocation of any recovery in this Action. (*Id*. ¶¶ 111-118.) Granting intervention will the save Court resources later if it has to approve a settlement containing compensation structures, as it will help ensure that this distinct subclass of textbook authors will have been properly at the table, heading off any additional challenges to the resolution of this matter.

## III.    Conclusion

If the Court grants leave to move, Dr. Saladin will respectfully file its motion to intervene requesting that the Court:

a.    Grant intervention as of right under 17 U.S.C. § 501(b) and Fed. R. Civ. P. 24(a)(2);

b.    Alternately, grant permissive intervention under Fed. R. Civ. P. 24(b);

c.    Accept the Proposed Complaint in Intervention for filing;

d.    Direct that textbook-author interests be addressed in early case management, including subclass structure and separate adequacy and Rule 23(g) considerations; and

e.    Set a coordinated briefing schedule consistent with the current case calendar.

Respectfully submitted,



David Slarskey

