UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
ELSEVIER INC., CENGAGE LEARNING, INC., :
HACHETTE BOOK GROUP, INC., MACMILLAN :
PUBLISHING GROUP, LLC, SCOTT TUROW, :
and S.C.R.I.B.E., INC. individually and on behalf of :
other similarly situated, :
:
Plaintiffs, :
:
- against - :
:
META PLATFORMS, INC. and MARK :
ZUCKERBERG, :
:
Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**[PROPOSED] COMPLAINT IN INTERVENTION OF KENNETH S. SALADIN, individually and on behalf of a proposed textbook-author subclass**

Index No. 26-cv-3689

Plaintiff KENNETH SALADIN ("Dr. Saladin"), by and through its attorneys, Slarskey LLC and Archstone Law, alleges as follows for his Complaint against Meta Platforms, Inc. and Mark Zuckerberg ("Defendants").

## INTRODUCTION

1. Plaintiff Kenneth Saladin brings this Complaint in Intervention to protect the distinct interests of textbook authors whose copyrighted educational works are included within the putative class alleged in this action. As pleaded, there is no plaintiff to represent the unique interests of textbook authors, who likely make up 20% or more of the class. Moreover, Plaintiffs' counsel are conflicted based on extensive and longstanding representations of publishers, adverse to the interests of authors. A subclass of textbook authors, for which Dr. Saladin proposes to serve as representative, is necessary to protect the interests of textbook authors in this litigation.

2. The operative complaint alleges copyright and Digital Millennium Copyright Act claims arising from Defendants' alleged unauthorized reproduction, distribution, and use of

copyrighted literary works in connection with Meta's generative artificial intelligence system known as Llama.

3. The putative class alleged in this action includes authors and publishers of literary works, including textbooks, scholarly works, and other written works.

4. Textbooks are books in all media whose primary markets are school, college, professional, and other educational courses and programs. Dr. Saladin seeks to intervene because textbook authors occupy a distinct position within the putative class and require separate representation, subclass consideration, and independent protection of their interests.

5. Textbook authors—none of whom are represented among the named putative class representatives (the "Publisher Plaintiffs")—have interests that differ from trade authors and publishers because textbook works are created, licensed, marketed, and monetized through distinctive educational markets, including markets for textbooks, study aids, solutions manuals, homework assignments, assessment questions, adaptive software, and online learning-platform materials.

6. These separate markets, and the distinct creative and commercial practices associated with textbooks, create differing legal interests and conflicts of interests between the subclass of textbook authors as compared to the other Publisher Plaintiffs, including authors of works other than textbooks.

7. Dr. Saladin therefore brings this pleading to assert his own claims and to preserve the interests of a proposed subclass of textbook authors whose works were allegedly copied, distributed, used for AI training, or otherwise infringed by Defendants.

**JURISDICTION AND VENUE**

8.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 because this action arises under the Copyright Act, 17 U.S.C. §§ 101 et seq., and the Digital Millennium Copyright Act, 17 U.S.C. § 1202.

9.    This Court has jurisdiction over Dr. Saladin's claims because they arise from the same alleged transactions, occurrences, and common nucleus of operative facts pleaded in the operative complaint, including Defendants' alleged acquisition, reproduction, distribution, and AI-training use of copyrighted written works.

10.    Venue is proper in this District because the operative complaint alleges that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including alleged copyright infringement and commercialization of Meta's Llama Models.

11.    This Court also has authority to adjudicate the class, subclass, and intervention-related issues raised by this pleading in connection with the pending putative class action.

**PARTIES**

12.    Plaintiff Kenneth Saladin is an individual residing in the State of Georgia and is the author of one or more textbooks published by McGraw Hill LLC, including (i) Anatomy & Physiology: The Unity of Form and Function; (ii) Human Anatomy; and (iii) Essentials of Human Anatomy. Dr. Saladin has beneficial interests, copyrights, exclusive rights, royalty interests, contractual rights, or other legally protected interests in these and other works that, upon information and belief, give him standing within the class.

13.    Plaintiffs Elsevier Inc. ("Elsevier"), Cengage Learning, Inc. ("Cengage"), Hachette Book Group, Inc. ("Hachette"), Macmillan Publishing Group, LLC d/b/a Macmillan Publishers ("Macmillan"), McGraw Hill LLC ("McGraw Hill"), Scott Turow, and S.C.R.I.B.E., Inc. filed this putative class action individually and on behalf of others similarly situated.

14.    The Publisher Plaintiffs allege that they publish, market, sell, and license books, textbooks, journals, learning materials, and other written works.

15.    Plaintiff Scott Turow ("Mr. Turow") is alleged to be a bestselling literary author, and Plaintiff S.C.R.I.B.E., Inc. ("S.C.R.I.B.E.") is alleged to own copyrights to his published books.

16.    Defendant Meta Platforms, Inc. ("Meta") is alleged to have developed and trained the Llama generative AI system using copyrighted works without authorization.

17.    Defendant Mark Zuckerberg ("Zuckerberg") is alleged to have personally authorized and encouraged the infringing conduct alleged in the operative complaint.

18.    Dr. Saladin seeks to represent, or to ensure separate representation for, a proposed subclass consisting of all textbook authors within the putative class whose textbook works were allegedly reproduced, distributed, used for AI training, or otherwise infringed by Defendants during the relevant class period (the "Textbook Authors").

19.    The operative complaint alleges that the class period begins at least on October 1, 2022, and runs through the present.

## FACTUAL ALLEGATIONS

### I.    General Allegations

20.    Both the Publisher Plaintiffs and Dr. Saladin, individually and on behalf of similarly situated Textbook Authors (all, collectively, "Plaintiffs") allege that Defendants reproduced and distributed copyrighted works without authorization in connection with sourcing content for, developing, and training Meta's Llama generative AI platform.

21.    Plaintiffs allege that Meta first obtained copyrighted books and journal articles through torrenting from pirate sites and through unauthorized web-scraped datasets, and then copied those works for use in training the Llama Models.

4

22.    Plaintiffs allege that the Llama Models include all versions, iterations, and relatives of Llama, including Llama 1, Code Llama, Llama 2, Llama 3, Llama 3.1, Llama 3.2, and Llama 4.

23.    Plaintiffs allege that Defendants' copying occurred in multiple stages, including downloading works, copying works into computer memory, converting works into formats usable by AI systems, and copying works into training materials used to build Llama models.

24.    Plaintiffs allege that Defendants' conduct affected works across a broad range of categories, including fiction, nonfiction, children's books, poetry, memoirs, travel writing, educational textbooks, and scholarly articles.

25.    Plaintiffs allege that the putative class consists of "[a]ll *legal or beneficial owners* of registered copyrights" for works allegedly reproduced, distributed, or otherwise used by Defendants without authorization.

26.    Plaintiffs allege that the named Publisher Plaintiffs include Elsevier, Cengage, Hachette, Macmillan, and McGraw Hill, and that those entities publish, market, sell, license, or distribute books, textbooks, journals, and other written materials.

27.    Plaintiffs allege that Elsevier publishes academic textbooks, journals, and examinations in the science, medical, and health sectors, and distributes journal articles and book chapters electronically through ScienceDirect.

28.    Plaintiffs allege that Cengage creates and publishes educational textbooks and other learning materials, including traditional and digital educational content for educators and students.

29.    Plaintiffs allege that McGraw Hill provides print and digital content, solutions, software, and services for PreK-12, higher education, and professional learning markets.

30.    Plaintiffs allege that the copied works include representative works from Cengage and McGraw Hill, including textbooks and educational works.

31.     Plaintiffs allege that each copied work is an original work, comprises copyrightable subject matter, is registered with the U.S. Copyright Office, and remains subject to valid copyrights owned or controlled by Plaintiffs in whole or in relevant part.

32.     Plaintiffs allege that Defendants copied the copied works in multiple ways without authorization or compensation.

33.     Plaintiffs allege that Defendants' unauthorized use displaced legitimate sales, deprived authors and publishers of revenues, and usurped the market for licensing copyrighted works for AI training.

34.     Plaintiffs allege that a market exists for licensing copyrighted works for AI training, and that AI companies have entered negotiated agreements with publishers, media companies, and academic institutions for access to books, articles, and journals for model development and training.

35.     Plaintiffs allege that Meta was aware of licensing markets for AI training materials and had secured certain licenses for training materials before allegedly abandoning publisher licensing efforts and torrenting pirate datasets.

36.     Plaintiffs allege that the Llama Models can generate outputs that substitute for copyrighted works, including verbatim or near-verbatim copies, summaries, alternative versions, imitations, and derivative works.

37.     Textbook authors generally, including members of the proposed Textbook Author subclass, hold a distinct position within the putative class because educational publishing involves markets and uses that differ from trade publishing and from scholarly journal publishing.

38.     Plaintiffs allege that the textbook market extends beyond the underlying textbook to associated materials that complement the learning process, including study aids, solutions

6

manuals, homework assignments, assessment questions, adaptive software, and online learning-platform materials.

39.    Plaintiffs allege that consumers, including students, often purchase not only textbooks but also supplemental learning materials or access to supplemental learning materials that accompany textbooks.

40.    Plaintiffs allege that publishers rely on copyright law to control dissemination of works, determine distribution terms and pricing, license works for various uses, engage in new markets, exploit new uses arising during a book's lifespan, and refrain from licensing certain uses.

41.    Textbook Authors' economic and legal interests are affected not only by alleged copying of their textbook text, but also by the alleged use of the Textbook Authors' pedagogical structure, explanation, sequencing, and educational presentation embodied in textbook works, typically informed by decades of classroom teaching.

42.    The Textbook Authors' interests are not identical to the interests of textbook publishers, who may own or control certain exclusive rights, negotiate licenses, administer educational platforms, and assert their own economic interests in works authored by Textbook Authors, including Textbook Plaintiffs.

43.    Nor are Textbook Authors' interests identical to those of trade authors, whose works are marketed and consumed in different markets and whose alleged market harms may be evaluated through different evidence and damages models, particularly as pertains to the effect of Defendants' practices on the market for Textbook Plaintiffs' works.

44.    The operative complaint itself reflects that the putative class includes both authors and publishers, and that publishers and authors may hold different and adversarial rights, contractual positions, and economic interests in the same or related works.

45.     Dr. Saladin seeks to participate in this action to ensure that the factual record concerning Textbook Authors, textbook markets, educational licensing, AI substitution for educational materials, and author-publisher allocation issues is developed separately and adequately.

## II.    The Textbook Author Subclass and Inadequacy of Representation

46.     Textbook Plaintiffs are an identifiable subclass within the putative class because the operative complaint includes educational textbooks among the literary works allegedly infringed and identifies textbook and educational publishing markets as distinct components of the alleged class injury.

47.     Textbook Authors' works are created and exploited in educational markets that differ from markets for trade fiction, general nonfiction, and scholarly works.

48.     Textbook publishing differs materially from trade and scholarly journal publishing in that works are frequently authored by multiple contributors across editions and formats; are accompanied by extensive supplemental materials such as test banks, slides, instructor manuals, online homework systems, and adaptive learning platforms; and rely on complex ecosystems of sales, licensing, sublicensing, and permissions to support classroom use and derivative instructional content.

49.     Textbook Authors face differing economic interests and typical contract terms concerning how copyrights are held or enforced and how proceeds are allocated in accordance with common contractual terms as compared to other authors.

50.     Unlike with trade and many academic publishing agreements, in textbook publishing agreements, publishers frequently require an assignment or transfer of copyright from the author while reserving author royalty and other participation rights. Such assignments are often

structured for administrative efficiency, including centralized registration, enforcement, and permissions/licensing administration.

51. The structure of this contractual relationship has led to exploitation in the industry, and creates the opportunity for publishers to deprive authors of recovery in this lawsuit.

52. Because textbook publishers often centralize control over registrations, sales, licensing, permissions, and copyright enforcement, they hold outsized leverage over Textbook Authors in administering multiple revenue streams and in characterizing how receipts and royalties are reported to authors, including in contexts such as settlements or third-party licenses where categorizations can materially affect Textbook Author participation and earnings.

53. The operative complaint alleges that educational publishers' markets include not only textbooks, but also related study aids, solutions manuals, homework assignments, assessment questions, adaptive software, online learning platforms, and other supplemental materials used in the learning process.

54. Both based on the textbooks, alone, and also the related works, the use of textbook works to train generative AI systems therefore implicates market-substitution issues that are distinct from those presented by trade books or general literary works.

55. For Plaintiffs, the alleged harm includes the risk that AI systems trained on educational works will compete with—and possibly undermine—the pedagogical function, sequencing, exposition, examples, and explanatory structure of textbooks and related educational materials.

56. Students enrolled in college, professional, and other courses are assigned textbooks to meet curricular goals. Students are motivated to acquire the knowledge needed to meet the curricular goals, to succeed on tests and certifications, and to advance in their academic and

professional fields. For these purposes, if the same knowledge can be acquired (or if students believe that it can be acquired) more quickly or less expensively from LLM's trained on the textbooks, students may substitute the LLM for the textbook. This is less the case for trade books.

57.    These interests are distinct from the interests of other authors and publishers, particularly insofar as there is no substitute for specific literary works.

58.    The unique interests of Textbook Authors require focused factual development concerning textbook markets, author royalty structures, educational licensing practices, AI substitution for instructional materials, and the relationship between textbook authors and educational publishers.

59.    Particularly as relates to the relationship between textbook authors and educational publishers, plaintiffs do not adequately represent textbook authors as a distinct group because the named plaintiffs combine authors and publishers in a single proposed class structure that does not include any textbook authors, and that does not have independent unconflicted representation.

60.    The Publisher Plaintiffs allege that they publish, market, sell, distribute, and license books, textbooks, journals, and educational content, and they assert claims based on copyrights or exclusive rights they own or control.

61.    Textbook Plaintiffs have interests that diverge from publishers and other authors with respect to licensing, allocation of recoveries, proof of market harm, control over AI uses, and the evidentiary presentation of author-specific injuries.

62.    The operative complaint alleges that publishers often hold or assume exclusive rights in authors' works and exercise those rights by making and disseminating copies and authorizing others to do so through licensing markets.

10

63. Those allegations show that publishers may have rights and economic incentives that are not coextensive with the interests of individual textbook authors as legal or beneficial owners of the same rights.

64. The existing author plaintiff, Mr. Turow, is alleged to be a bestselling author of fiction and nonfiction books, and S.C.R.I.B.E. is alleged to own copyrights to his published books.

65. Dr. Saladin does not allege that Mr. Turow lacks standing to pursue his own claims; rather, Dr. Saladin alleges that a trade-author plaintiff does not adequately represent textbook authors' distinct interests in educational works, pedagogical markets, and author-publisher allocation issues.

66. The risk of inadequate representation is further confirmed by the experience of undersigned counsel, and the Textbook & Academic Authors Association in the *Bartz v. Anthropic* class litigation,[1] where the putative class included authors and copyright holders whose books were allegedly copied for AI training.

67. In sum, as *Bartz* unfolded, and as described below, textbook authors in the *Bartz* case identified subclass-specific conflicts and a distribution process that treated textbook authors differently from trade and academic authors—reflecting structural risks to textbook authors' recoveries absent separate representation.

68. The *Bartz* action was filed on August 19, 2024. The complaint alleged claims on behalf of a class including books allegedly copied for Anthropic PBC's ("Anthropic") Claude family of models. The class allegations did not distinguish authors from publishers, or textbook authors from other authors, for purposes of pleading the class claims, nor did the complaint address

---

[1] *Bartz v. Anthropic PBC*, No. 24-cv-05417 (N.D.Cal.).

11

the unique damages associated with the specific economic, legal, pedagogical, and market substitution concerns of textbook authors.

69.    The class representatives in *Bartz* were all trade authors, represented by the law firms of Susman Godfrey LLP ("Susman Godfrey") and Lieff Cabraser Heimann & Bernstein LLP ("Lieff Cabraser"). Though textbook authors were included in the *Bartz* class, none of the class representatives were textbook authors.

70.    On August 11, 2025, weeks before moving for preliminary approval of a class settlement—and with the "approval of the American Association of Publishers," Susman Godfrey filed an "Association of Counsel" notice with the *Bartz* court, identifying Oppenheim+Zebrak, LLP ("Oppenheim+Zebrak")—counsel for the Publishers Plaintiffs in this case—as "additional counsel to assist Class Counsel in representing the Class."

71.    In the notice of association, Susman Godfrey represented to the Court that Oppenheim+Zebrak, along with Edelson P.C., would "serve as Publishers' Coordination Counsel, *representing the interests of publishers* in the common goal of maximizing the per-work recovery for the Class." (emphasis supplied).

72.    The parties in *Bartz* mediated on August 19, 2025, and presented the court with a notice of settlement on August 26, 2025. The mediation included class counsel (Susman Godfrey) representing the trade author plaintiffs and the class, along with the newly-associated "Publishers' Coordinating Counsel," Oppenheim+Zebrak and Edelson, P.C.

73.    Textbook Authors were not separately represented at the August 19, 2025, mediation.

74.    On September 5, 2025, the parties in *Bartz* moved for preliminary approval of a class settlement. The proposed plan of allocation for the settlement proceeds did not disclose how

recoveries would be allocated for any particular work in the zero-sum exercise between publishers and authors. Instead, counsel represented to the Court that "authors and publishers are in business together and will work out the best way to recover."

75. Educational publishers and textbook authors, in particular, have had a consistently contentious relationship in recent years over similar allocation issues, as reflected in various lawsuits in this District, including *Bernstein v. Cengage Learning, Inc.*, No. 19-cv-07541 (S.D.N.Y.) and *Flynn v McGraw Hill LLC*, No. 21-cv-00614 (S.D.N.Y.). McGraw Hill is Dr. Saladin's publisher, and adverse to Dr. Saladin and other authors in the *Flynn* case over apportioning royalties with authors.

76. Cengage is one of the publishers in the *Bartz* class and is a named plaintiff and putative class representative here. Cengage is adverse to its authors with respect to the unique interests identified on behalf of textbook authors herein.

77. The court in *Bartz* held a conference on September 8, 2025, to discuss the putative settlement agreement. At that conference the court expressed "disappoint[ment]" and a belief it had "been misled," because instead of a "complete preliminary agreement," counsel had presented "an agreement to agree" without an agreed upon plan of allocation for the proceeds.

78. At the September 8, 2025, conference, the *Bartz* court also expressed it was "worried" about "what [was] going on behind the scenes," insofar as it appeared that with the appearance of new counsel on behalf of the publishers (including Oppenheim+Zebrack, Publisher Plaintiffs' counsel here), class counsel appeared to be "working out, behind the scenes, between publishers some kind of a deal that you want to force down the throat of authors or—mainly the authors—and say you got to take X percent, even though their own agreements give them 100 percent. If they did. Maybe they don't. Maybe they're silent. Who knows?"

13

79. Even though a representative of the Authors Guild (which represents primarily trade authors) had participated in the mediation, the Court expressed concern that "you've got somebody from the Guild who's going to force [any settlement] down the throat of every author," including textbook authors.

80. Following the *Bartz* court declining to grant preliminary approval of the September 5, 2025, proposed settlement, class counsel (Susman Godfrey and Lieff Cabraser) invited the Textbook and Academic Authors Association ("TAA") to participate in additional mediation and settlement talks, to provide input to the plan of allocation for settlement proceeds, in particular as to how that plan affected textbook and academic authors.

81. Though Textbook Authors did not seek to be recognized as a subclass in *Bartz*, TAA was represented by the undersigned, Slarskey LLC and Archstone Law Group, and participated in confidential mediation proceedings that took place during the week of September 13–20, 2025. That mediation led to the settlement agreement and plan of allocation ultimately submitted for approval in *Bartz*.

82. Class counsel represented to the *Bartz* court, in counsel's fee application, that Slarskey LLC and Archstone Law Group were "experienced in representing authors" and agreed, as disclosed to the Court, to compensate Slarskey LLC and Archstone Law Group for their contributions in representing TAA in the additional settlement discussions.

83. A conflict exists, or will exist, between Publisher Plaintiffs and Textbook Plaintiffs with respect to the allocation of any recovery from Defendants in this case, because settlement proceeds are generally allocated pursuant to contractual agreements between authors and publishers that are subject to differing interpretations by authors and publishers.

84.     Industry standards and norms differ as between textbook authors and educational publishers on the one hand, and between trade and academic authors and their publishers on the other. That is because (as noted above) the commercial marketplace—both the supply and demand—for educational works is structured differently from the commercial marketplace(s) for trade and academic works. Typical contractual terms between textbook authors and educational publishers thus differ from the typical contractual terms between trade and academic authors and their publishers, including with respect to how copyrights are held or enforced.

85.     Textbook royalties are typically paid on a publisher's *net receipts*, while trade book royalties are typically paid on *list price*. This difference provides for different financial bases and assumptions in the distinct markets.

86.     Trade book contracts typically specify a division between publisher and author (typically 50%) of proceeds from copyright infringement claims. Textbook contracts typically do not specify any specific division, leaving any allocation open to argument as to which contractual provisions apply. As demonstrated in the *Bartz* case, discussed below, publishers can use their resources to impose disadvantageous splits on authors.

87.     Textbook contracts typically assign to the publisher rights to the current edition and all future editions of the text. It is often very difficult for authors to regain rights and take future editions elsewhere. This can lead to a lifetime commitment of authors to their publishers and puts publishers in a position of market power, enabling them to impose disadvantageous arrangements on authors. The *Bartz* experience discussed below demonstrates publishers' willingness to do so.

88.     The difference between textbook authors and other authors is demonstrated by the terms ultimately proposed by the parties, as represented by class counsel, and adopted by the Court in the *Bartz* settlement: textbook authors were obligated to navigate a separate, more burdensome

process than trade and academic authors, to establish their share of the recoveries from the *Bartz* settlement.

89.    Instead of enjoying a "default" 50/50 split of recoveries between publishers and authors, as the parties agreed trade and academic authors would receive, the trade author representatives in *Bartz*, represented by class counsel and assisted by "Publishers' Coordinating Counsel" agreed to a process imposed upon textbook authors in which textbook authors were obligated either to accept an indefinite settlement *with no indication of what the their recovery would be*, or opt out from the settlement and pursue their claims separately.

90.     In *Bartz*, unlike trade and academic authors, textbook authors were obligated to advocate in the claims process for a particular share of the recovery, provide information (if they had it) and meet-and-confer with publishers to try and negotiate a resolution—or if necessary, potentially submit disputes to a Special Master.

91.    The distribution plan negotiated in *Bartz*, and to which textbook authors were subjected, strongly favors educational publishers, as compared to textbook authors, because the significantly fewer number of educational publishers have better information, greater resources, and stronger incentives to act strategically across large portfolios of works than individual textbook authors.

92.    The disparity is evidenced by the data in *Bartz* pertaining to claims rates for publishers vs. authors, and textbook authors vs. other authors.

93.    Because textbook authors were not separately represented and recognized as a subclass in *Bartz*, their specific approval to the settlement agreement and plan of allocation was not required on a class-wide basis. TAA was placed in the difficult position of either supporting a class settlement that had been formed before TAA was invited into the process, or seeking to

undermine a settlement that provided significant benefits to trade and academic authors, and a path to recovery, if somewhat more burdensome, for textbook authors.

94. TAA relied on class counsel in *Bartz*, and associated counsel including Oppenheim+Zebrack, to protect textbook authors in the administration process, which was not fully defined in the settlement agreement.

95. In the course of claim administration for *Bartz*, TAA sought to intervene in the action after identifying private, unfair publisher communications that TAA believed could mislead textbook authors concerning the claims process and the allocation of settlement proceeds.

96. In *Bartz*, one of the major educational publishers sent a mass email to its textbook authors during the class opt-out period, which asserted that in many instances the authors should claim entitlement to only the sales royalty rate (e.g., 10%) of the proceeds, while warning authors against seeking third-party assistance and instructing authors to agree swiftly to "avoid delays."

97. This communication suggested that textbook authors should receive a significantly lower recovery than other authors.

98. Such actions undermined the integrity of the claims process and threatened to deprive textbook authors of their fair share of the recovery by manufacturing uncontested, publisher-favorable positions despite the fact that the textbook publishing contracts are frequently ambiguous on this point and textbook authors should receive a *pro rata* recovery in line with other authors.

99. Other publishing contracts often address allocations for subsidiary rights and permissions with greater certainty than do textbook contracts. The structure of typical textbook contracts create subclass-specific conflicts and a material risk that textbook authors' *pro rata*

recovery will be reduced through publisher-favored maneuvering and claims-administration practices unless textbook authors are separately represented.

100. TAA sought intervention to *Bartz*, represented by the undersigned, after inquiries to class counsel were ignored. Upon information and belief, class counsel conferred with Oppenheim+Zebrak on those concerns and determined to ignore TAA's efforts to advocate for fair treatment of textbook authors. Only *after* TAA formally sought to intervene did class counsel then agree to support TAA in obtaining the curative measures it sought.

101. Each of the law firms representing the Publisher Plaintiffs has a long history of representing publishing companies, which makes them conflicted in any matter where publishers' interests would come into conflict with authors' interests, including with respect to settlement or allocation of proceeds between authors and publishers.

102. As an example, on September 22, 2025, Matthew Oppenheim ("Mr. Oppenheim") of Oppenheim+Zebrak provided the court in *Bartz* with a declaration in support of preliminary approval for the class settlement. In that declaration, Mr. Oppenheim stated that prior to the *Bartz* matter (to which his firm had been associated just weeks prior), his firm "had never served as counsel in a class action," but was the "go-to copyright litigation firm for many of the biggest content companies in the world, *including numerous book publishers*," whose interests in allocating any settlement or proceeds were adverse to textbook authors in the class.

103. Mr. Oppenheim further stated that his firm "has served as the primary counsel to the publishing industry dealing with the problem of mass counterfeiting of physical books," and "worked with the publishing industry and with book distributors to develop Best Practices for distributors."

104. Dr. Saladin alleges that the foregoing events demonstrate a concrete and foreseeable risk that Textbook Plaintiffs will be disadvantaged if they are not separately represented from the beginning of this action.

105. Dr. Saladin further alleges that proposed class counsel must be evaluated separately for Textbook Plaintiffs because counsel representing publishers may face structural conflicts when author and publisher interests diverge.

106. The operative complaint seeks certification of a class that includes both authors and publishers and seeks appointment of Publisher Plaintiffs' counsel as Class Counsel.

107. Publisher Plaintiffs' counsel has a conflict of interest with respect to representing Textbook Plaintiffs—upon information and belief many of the same authors as in the *Bartz* class— as Publisher Plaintiffs' counsel are currently undertaking in *Bartz* to "represen[t] the interests of publishers" in a currently-pending action where the class is made up of many of the same publishers and authors, and are the "go-to copyright litigation firm for many of the biggest content companies in the world, including numerous book publishers," in an action where publishers and authors' interests are in conflict.

108. Dr. Saladin alleges that Textbook Plaintiffs require separate subclass consideration, separate adequacy analysis, and separate subclass counsel to ensure that their claims, evidence, settlement positions, and allocation interests are not subordinated to the interests of publishers or non-textbook authors.

## III.    Intervention Allegations

109. Dr. Saladin's intervention is timely because this action was filed on May 5, 2026, and Defendants have not yet appeared, answered, moved, or otherwise responded to the operative complaint.

110.    No class has been certified, no class representative has been appointed, no class counsel has been appointed, no merits discovery has occurred, and no settlement has been presented for approval.

111.    Dr. Saladin seeks intervention at the outset to ensure that Textbook Plaintiffs' interests are addressed before the pleadings, discovery plan, class-certification strategy, Rule 23(g) process, and any settlement structure are fixed.

112.    Dr. Saladin has a direct and protectable interest in this action because the operative complaint alleges claims on behalf of authors and publishers of written literary works, including educational textbooks, whose works were allegedly reproduced, distributed, and used for AI training without authorization.

113.    Dr. Saladin's interests relate to the same alleged transactions and occurrences at issue in the operative complaint, including Defendants' alleged acquisition of copyrighted works from pirate datasets and web-scraped datasets, alleged copying of those works into AI-training materials, and alleged use of those works to train the Llama Models.

114.    Disposition of this action may impair or impede Dr. Saladin's ability to protect his interests and the interests of similarly situated textbook authors because the operative complaint seeks certification of a class, appointment of class representatives, appointment of class counsel, damages, injunctive relief, destruction of allegedly infringing copies, an accounting, attorneys' fees, costs, and other classwide relief.

115.    If Textbook Plaintiffs are not separately represented, decisions concerning pleading theories, discovery priorities, proof of market harm, damages methodology, injunctive relief, settlement allocation, and class governance may be made without adequate attention to their distinct interests.

116.    The existing plaintiffs do not adequately protect Dr. Saladin's interests because they include publisher plaintiffs, a trade-author plaintiff, and an entity associated with that trade author, but no named plaintiff whose pleaded role is to represent Textbook Plaintiffs as a distinct group.

117.    The Publisher Plaintiffs allege that they publish, market, sell, license, and distribute educational, scholarly, trade, and other written works, and they assert claims based on rights they own or control.

118.    Textbook Plaintiffs' interests may diverge from publishers concerning author-specific harms, royalty and licensing interests, allocation of recoveries, settlement structure, and control over future AI uses of textbook works.

119.    The *Bartz* experience shows that those risks are practical rather than theoretical because TAA—invited into negotiations at a late date, after the terms of a preliminary settlement had already been presented to the court—asserted that textbook authors were treated differently from trade and academic authors in the settlement-allocation process and required additional intervention-related relief to address author-publisher conflicts during settlement administration.

120.    In the alternative, permissive intervention is appropriate because Dr. Saladin's claims share common factual and legal questions with the existing action, including whether Defendants reproduced copyrighted works, whether Defendants distributed copyrighted works through torrenting, whether Defendants used copyrighted works in AI training, whether any such use infringed exclusive rights, whether Defendants' conduct was willful, and what relief is available.

21

121.    Dr. Saladin's intervention will not unduly delay or prejudice adjudication of the original parties' rights because he seeks to intervene before Defendants have appeared and before the Court has entered a class-certification, discovery, or merits schedule.

122.    Dr. Saladin's participation will assist the Court by presenting the distinct interests of Textbook Plaintiffs at the outset, including issues concerning educational markets, textbook-specific harms, subclass structure, adequacy of representation, and appropriate appointment of subclass counsel.

## CAUSES OF ACTION

123.    Dr. Saladin incorporates by reference the foregoing paragraphs as though fully set forth herein.

124.    Dr. Saladin asserts, and seeks through intervention to preserve for himself and similarly situated textbook authors, claims for copyright infringement under the Copyright Act, including claims arising from Defendants' alleged unauthorized reproduction and distribution of copyrighted written works.

125.    The Copyright Act grants copyright owners exclusive rights including the rights to reproduce copyrighted works and to distribute copies of copyrighted works. 17 U.S.C. § 106.

126.    Plaintiffs allege that Defendants reproduced copyrighted works through torrenting, reproduced copyrighted works through downloading web-scraped datasets, reproduced copyrighted works in training Meta's AI models, and distributed copyrighted works through torrenting.

127.    Plaintiffs further allege that Defendants' conduct violated the Copyright Act, including 17 U.S.C. §§ 106(1), 106(3), and 501.

128.    Dr. Saladin owns, controls, or has legally protected interests in copyrights, exclusive rights, royalty interests, contractual interests, or other rights in one or more textbook

works, including (i) Anatomy & Physiology: The Unity of Form and Function and (ii) Human Anatomy.

129.    17 U.S.C. § 501(b) provides that "[t]he legal *or beneficial owner* of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it . . . The court may require the joinder, and *shall permit the intervention*, of any person having or claiming an interest in the copyright" (emphasis supplied).

130.    On information and belief, one or more of Dr. Saladin's textbook works were included in datasets, repositories, corpora, training materials, or other collections allegedly acquired, reproduced, distributed, processed, or used by Defendants in connection with the conduct challenged in this action.

131.    On information and belief, Defendants reproduced Dr. Saladin's copyrighted textbook works without authorization by copying those works in connection with obtaining source materials, preparing datasets, processing training materials, storing works, loading works into computer systems, and training or developing the Llama Models.

132.    On information and belief, Defendants distributed Dr. Saladin's copyrighted textbook works without authorization to the extent Defendants obtained or shared those works through torrenting or other file-sharing processes alleged in the operative complaint.

133.    On information and belief, Defendants' conduct infringed Dr. Saladin's exclusive rights and the exclusive rights of similarly situated textbook authors.

134.    On information and belief, Defendants' conduct was willful, intentional, and undertaken with knowledge of or reckless disregard for the rights of Dr. Saladin and similarly situated textbook authors.

135. Dr. Saladin and similarly situated textbook authors have suffered and will continue to suffer harm from Defendants' alleged infringement, including loss of licensing opportunities, loss of control over protected uses of their works, interference with textbook and educational-content markets, and other injuries to be proven in this action.

136. Dr. Saladin and similarly situated textbook authors are entitled to all remedies available under the Copyright Act, including statutory damages under 17 U.S.C. § 504(c), or, at their election, actual damages and Defendants' profits under 17 U.S.C. § 504(b), together with injunctive relief, costs, and attorneys' fees as authorized by law.

137. Dr. Saladin also adopts, to the extent applicable to his works and interests, the classwide copyright-infringement theories asserted in the operative complaint, while reserving the right to assert textbook-author-specific proof, defenses to any asserted fair-use position, damages theories, and injunctive-relief theories on behalf of himself and the proposed textbook-author subclass.

## **PRAYER FOR RELIEF**

WHEREFORE, Dr. Saladin respectfully requests that the Court enter judgment and relief as follows:

a. Granting Dr. Saladin leave to intervene in this action;

b. Permitting Dr. Saladin to file this Complaint in Intervention;

c. Certifying, at the appropriate time, a textbook-author subclass or otherwise ensuring separate representation and protection for textbook authors within any certified class;

d. Appointing Dr. Saladin as representative of the proposed textbook-author subclass, if appropriate;

e. Appointing Slarskey LLC and Archstone Law Group as separate counsel for the proposed textbook-author subclass, or otherwise conducting separate Rule 23(a)(4) and Rule 23(g) adequacy review for textbook authors;

f.    Awarding Dr. Saladin and similarly situated textbook authors statutory damages or, at their election, actual damages and Defendants' profits, as permitted by the Copyright Act;

g.    Awarding appropriate declaratory and injunctive relief to protect Dr. Saladin's and textbook authors' copyrighted works and exclusive rights;

h.    Requiring any classwide settlement, allocation plan, release, or judgment to separately account for the rights and interests of textbook authors;

i.    Awarding reasonable attorneys' fees, costs, and expenses as permitted by law;

j.    Awarding pre-judgment and post-judgment interest as permitted by law; and

k.    Granting such other and further relief as the Court deems just and proper.

Dr. Saladin demands a trial by jury on all claims and issues so triable.

Dated: May 29, 2026
       New York, New York                    SLARSKEY LLC

                                             By:_____
                                             David Slarskey
                                             Adam Hollander
                                             Deepa Devanathan
                                             Phillip Gasperetti
                                             767 Third Avenue, 14th Floor
                                             New York, New York 10017
                                             (212) 658-0661

                                             ARCHSTONE LAW GROUP
                                             Brenda Ulrich, *pending pro hac application*
                                             Zick Rubin, *pending pro hac application*
                                             Riverside Center
                                             275 Grove Street, Suite 2-400
                                             Newton, MA. 02466

25