**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELSEVIER INC., CENGAGE LEARNING, INC., HACHETTE BOOK GROUP, INC., MACMILLAN PUBLISHING GROUP, LLC D/B/A MACMILLAN PUBLISHERS, MCGRAW HILL LLC, SCOTT TUROW, and S.C.R.I.B.E., INC., individually and on behalf of others similarly situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>META PLATFORMS, INC. and MARK ZUCKERBERG,<br><br>    Defendants. | Civil Action No. 1:26-cv-03689-PKC |

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER VENUE**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    I.      Plaintiffs' claims against Meta stem from Meta's misconduct in New York, the heart of the publishing industry. ............................................................................................. 3

        A.   New York is the central hub of the U.S. publishing industry. ...................................... 4

        B.   Meta's New York employees, offices, and resources were directly involved in the infringing activity at issue. .............................................................................. 6

    II.     This case is not the same as *Kadrey* or other lawsuits against Meta in California .......... 9

LEGAL STANDARD ......................................................................................................... 9

ARGUMENT ..................................................................................................................... 11

    I.      The "first-filed rule" does not supersede Meta's burden to show, by clear and convincing evidence, that convenience strongly favors transfer under § 1404(a). ....... 11

    II.     The balance of convenience weighs decidedly in favor of this District. ....................... 14

        A.   Plaintiffs' choice of forum is entitled to substantial deference ................................... 14

        B.   The remaining convenience factors favor Plaintiffs or are neutral .............................. 16

           1.  Because no identified witnesses would be inconvenienced by proceeding in this District, this factor favors this District ....................................................... 16

           2.  Because transfer would merely shift inconvenience to Plaintiffs, convenience of the parties favors this District. ............................................................................ 20

           3.  Because New York is a locus of operative facts, this factor favors this District. ....... 21

           4.  Trial efficiency and interests of justice are neutral or slightly favor this District. ..... 23

           5.  The remaining factors are neutral. .......................................................................... 25

CONCLUSION .................................................................................................................. 26

# TABLE OF AUTHORITIES

**CASES**

*Am. Steamship Owners Mut. Prot. & Indem. Ass'n v. Lafarge N. Am., Inc.*,
474 F. Supp. 2d 474 (S.D.N.Y. 2007). ............................................................. 12

*Atl. Recording Corp. v. Project Playlist, Inc.*,
603 F. Supp. 2d 690 (S.D.N.Y. 2009) ...................................................... 18, 21, 22

*Bennett v. Sterling Planet, Inc.*,
No. 09-cv-1176 (GLS/DRH), 2010 WL 11566003 (N.D.N.Y. Mar. 22, 2010) ..................... 16

*Calabrese v. Teoco Corp.*,
637 F. Supp. 2d 160 (S.D.N.Y. 2009) ................................................................ 21

*Car-Freshner Corp. v. Meta Platforms, Inc.*,
No. 22-cv-1305 (MAD/ML), 2023 WL 7325109  (N.D.N.Y. Nov. 7, 2023) ........................ 17

*Chanel, Inc. v. Shiver & Duke LLC*,
No. 1:21-cv-01277 (MKV), 2022 WL 3868113 (S.D.N.Y. Aug. 30, 2022) ........................ 17

*D.H. Blair & Co., Inc. v. Gottdiener*,
462 F.3d 95 (2d Cir. 2006) ................................................................... 11

*Day Vill. Ltd. P'ship v. CW Cap. L.L.C.*,
No. 06-cv-3424 (LTS)(HBP), 2006 WL 2572118 (S.D.N.Y. Sept. 7, 2006) ...................... 16

*Dow Jones & Co. Inc. v. Perplexity AI, Inc.*,
797 F. Supp. 3d 305 (S.D.N.Y. 2025) ............................................................ 14

*EasyWeb Innovations, LLC v. Facebook, Inc.*,
888 F. Supp. 2d 342 (E.D.N.Y. 2012)  ...................................................... 17, 18, 25

*Ed. Musical Latino Americana, S.A. v. Mar Int'l Recs., Inc.*,
829 F. Supp. 62 (S.D.N.Y. 1993) ............................................................... 16

*Emp'rs Ins of Wausau v. Fox Entm't Group, Inc.*,
522 F.3d 271 (2d. Cir. 2008) ................................................................. 12

*Erickson v. Corinthian Colleges, Inc.*,
No. 13-cv-4308-PKC, 2013 WL 5493162 (S.D.N.Y. Oct. 1, 2013) ............................. 15

*ESPN, Inc. v. Quiksilver, Inc.*,
581 F. Supp. 2d 542 (S.D.N.Y. 2008) .......................................................... 25

*Factors Etc., Inc. v. Pro Arts, Inc.*,
579 F.2d 215 (2d Cir. 1978) .................................................................. 16

*Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*,
865 F.2d 513 (2d Cir. 1989) .................................................................. 10

*Freeplay Music LLC v. Gibson Brands, Inc.*,
195 F. Supp. 3d 613 (S.D.N.Y. 2016) .......................................................... 21

*Hachette Book Group, Inc. et al. v. Google LLC*,
No. 26-cv-5870 (S.D.N.Y. July 10, 2026) .................................................................................. 21

*Huckabee v. Meta Platforms, Inc.*,
No. 23-cv-09152-LGS, ECF 69 (S.D.N.Y. Dec. 28, 2023) ...................................................... 13

*In re Arb. between Griffin Indus., Inc. & Petrojam, Ltd.*,
58 F. Supp. 2d 212 (S.D.N.Y. 1999) ........................................................................................ 13

*In re Bystolic Antitrust Litig.*,
No. 20-cv-5735 (LJL), 2021 WL 148747 (S.D.N.Y. Jan. 15, 2021) ........................................ 15

*In re Geopharma, Inc.*,
No. 04-cv-9463 (SAS), 2005 WL 1123883 (S.D.N.Y. May 11, 2005) ..................................... 14

*In re Google Generative AI Copyright Litig.*,
No. 5:23-cv-03440-EKL (N.D. Cal.) ........................................................................................ 21

*In re Warrick*,
70 F.3d 736 (2d Cir. 1995) ....................................................................................................... 15

*Interparfums Luxury Brands, Inc. v. Gabet*,
No. 23-cv-6269 (PKC), 2024 WL 1116879] (S.D.N.Y. Mar. 13, 2024) ........................... passim

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) ............................................................................. passim

*Kimble v. Opteon Appraisal, Inc.*,
No. 23-cv-6399-FPG-MJP, 2025 WL 1509996 (W.D.N.Y. May 28, 2025) ........................... 10

*Manchin v. PACS Grp., Inc.*,
No. 24-cv-8636 (LJL), 2025 WL 1276569 (S.D.N.Y. May 1, 2025) ...................................... 20

*Marotto v. Kellogg Co., et al.*,
No. 18-cv-3545 (AKH), 2018 WL 10667923 (S.D.N.Y. Nov. 29, 2018) ......................... 19, 24

*Mirror Worlds Techs., LLC v. Facebook, Inc.*,
No. 17-cv-3473 (JGK), 2017 WL 5634127 (S.D.N.Y. Nov. 20, 2017) ............................. 17, 18

*MK Sys., Inc. v. Schmidt*,
No. 04-cv-8106 (RWS), 2005 WL 590665 (S.D.N.Y. Mar. 10, 2005) ................................... 12

*New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
599 F.3d 102 (2d Cir. 2010) ....................................................................................... 10, 11, 12

*New York v. Pruitt*,
No. 18-cv-1030 (JPO), 2018 WL 2411595 (S.D.N.Y. May 29, 2018) .................................... 25

*Pilevesky v. Suntrust Bank*,
No. 10-cv-2290 (JS) (ETB), 2010 WL 4879006 (E.D.N.Y. Nov. 22, 2010) ........................... 19

*Scalia v. KDE Equine, LLC*,
No. 19-cv-3389 (KAM) (SJB), 2020 WL 4336395 (E.D.N.Y. July 28, 2020) ....................... 16

*Tianhai Lace USA Inc. v. Forever 21, Inc.*,
No. 16-cv-5950, 2017 WL 4712632 (S.D.N.Y. Sept. 27, 2017) ............................................. 10

*United States v. New York*,
   No. 25-cv-3656 (PKC), 2025 WL 2208941 (S.D.N.Y. Aug. 4, 2025) .................. 11, 12, 14, 25

*Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*,
   No. 22-cv-2538 (LJL), 2022 WL 17067984 (S.D.N.Y. Nov. 17, 2022) ........................... 18, 19

**STATUTES**

17 U.S.C. § 1202 ............................................................................................................................ 4

28 U.S.C. § 1404 ................................................................................................................... passim

Plaintiffs Elsevier Inc. ("Elsevier"); Cengage Learning, Inc. ("Cengage"); Hachette Book Group, Inc. ("Hachette"); Macmillan Publishing Group, LLC ("Macmillan"); and McGraw Hill LLC ("McGraw Hill") (collectively, "Publishers"); and Scott Turow and S.C.R.I.B.E., Inc. (collectively, "Turow," and together with Publishers, "Plaintiffs") hereby respond to Meta Platforms, Inc.'s ("Meta") Motion to Transfer Venue to the Northern District of California (Dkt. No. 58), and Mark Zuckerberg's ("Zuckerberg," and together with Meta, "Defendants") Joinder to the same (Dkt. No. 59).

## **INTRODUCTION**

Publishers and authors have joined forces to hold Meta and its leader accountable for brazen infringement of millions of copyrighted works to build their commercial AI technologies. Plaintiffs intend to put forward evidence showing how that massive infringement harms a broad cross-section of the literary ecosystem—including the trade, education, and scientific sectors—in the District where the harm cuts deepest and where much of the misconduct occurred.

This case belongs here, in New York City. This District has been the epicenter of the U.S. publishing industry since 1807 when Charles Wiley set up a small printing press in lower Manhattan. It is home to most of the nation's significant publishers, including Plaintiffs, Hachette and Macmillan, and has been for centuries. Plaintiff McGraw Hill was founded in New York City in 1888 and has maintained a significant presence here ever since. Elsevier has likewise made its home here since 1937.

New York City is also a hub for Meta's AI operations and a locus of operative facts for this case. Notably, Meta sought licenses from publishers in New York for AI training rights, then abandoned those efforts upon concluding that "if we license once [sic] single book, we won't be able to lean into the fair use strategy." ECF 1, Compl. ¶ 98. And Meta's New York employees were directly involved in the decision and effort to download troves of books and journals from

1

notorious pirate sites and train Meta's commercial large language models ("LLMs") on Plaintiffs' and the class's stolen works. The resulting harm is substantially felt in New York City given the industry's ties here.

Defendants ignore these facts and simply point to other AI copyright cases pending against Meta in the Northern District of California as the basis for transfer. In doing so, they overstate the significance of the "first-filed" rule and attempt to shift the burden to Plaintiffs to explain why the case should not be transferred. Second Circuit law is clear, however, that the first-filed rule is not a trump card and does not supersede other considerations in the transfer analysis. Nor does it relieve Defendants of their burden to establish by clear and convincing evidence a strong case for transfer under 28 U.S.C. § 1404(a). Defendants' motion fails under this standard because they do not show—and certainly not by clear and convincing evidence— that the balance of convenience, efficiency, and interests of justice favor transfer.

As for the earlier filed California cases, Defendants distort and overstate their significance to the efficiency analysis. They focus primarily on *Kadrey v. Meta*, No. 3:23-cv-03417-VC (N.D. Cal.) ("*Kadrey*"), the sole putative class case they cite, and downplay the fact that *Kadrey* largely has been resolved on the merits. Defendants never mention that the court dismissed most of the claims on summary judgment before class certification, on a record that the court found insufficiently developed by those plaintiffs. *See Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1036–37 (N.D. Cal. 2025). The *Kadrey* court made clear that its "ruling does not stand for the proposition that Meta's use of copyrighted materials to train its language models is lawful. It stands only for the proposition that these plaintiffs made the wrong arguments and failed to develop a record in support of the right one." *Id.*

As such, there is minimal parallel litigation between this class action and *Kadrey*. Just

2

one claim in *Kadrey* overlaps with the six claims asserted here. The *Kadrey* plaintiffs do not include any publishers or plead any claims against Zuckerberg or other Meta executives. The remaining California cases Meta cites are all individual (not class) actions, all in their infancies, and their outcomes will have no meaningful bearing on the larger putative class here.

Meta itself has told the California court that it doubts *Kadrey* can ever be certified as a class action and that *Kadrey* should not be the lead case to adjudicate Meta's infringement. Days before filing the instant Motion, Meta told the *Kadrey* court that, "[e]ven if there was a basis for eventual class certification, it is also unclear if [*Kadrey*] would be the appropriate vehicle for it, as this Court has questioned whether it would be preferable for certification to await the filing of another class action asserting copyright infringement claims based on LLM training." *Kadrey*, ECF 748 n.3 (identifying the instant case). In the space of just one week, Meta told this Court that this class action must give way to *Kadrey*, while telling the *Kadrey* court that *Kadrey* is not an "appropriate vehicle for [] class certification."

Because Defendants cannot meet their burden, Plaintiffs' choice of forum should be honored and Defendants' motion denied.

**BACKGROUND**

I.    **Plaintiffs' claims against Meta stem from Meta's misconduct in New York, the heart of the publishing industry.**

Plaintiffs, five publishers and a bestselling author,[1] filed this putative class action against Meta and Zuckerberg to hold them accountable for one of the most massive infringements of copyrighted materials in history. Compl. ¶ 1.

The Complaint alleges that Defendants illegally torrented and copied Plaintiffs' and the

---

[1] The remaining plaintiff, S.C.R.I.B.E., Inc., is a corporate entity that owns Mr. Turow's copyrights.

3

class's works from known pirate sites and, without authorization, scraped copyrighted materials from billions of webpages. *See id.* ¶¶ 60–107. Defendants then copied those stolen works many times over to train Meta's generative AI system called Llama. *Id.* ¶¶ 108–114. They also removed copyright management information ("CMI") from those works to conceal their infringement. *Id.* ¶¶ 115–119. Defendants' conduct upended the growing licensing market for AI training and flooded the market with substitute works—reaping enormous profits at Plaintiffs' and proposed class members' expense. *Id.* ¶¶ 128–166.

The Complaint alleges claims for direct infringement against all Defendants through (1) reproduction by torrenting, (2) reproduction via unauthorized web scraping, (3) reproduction in training, (4) distribution by torrenting, (5) contributory copyright infringement against Zuckerberg, and (6) removal of CMI against all Defendants in violation of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202(b). *Id.* ¶¶ 176–236.

Both Plaintiffs and Meta have significant ties to this District, and New York City is inextricably linked to the claims at issue in this case.

## A. New York is the central hub of the U.S. publishing industry.

New York City is the center of the U.S. publishing industry and has been for more than two centuries. Compl. ¶ 29; Declaration of Jeffrey M. Gould ("Gould Decl.") Ex. A. Today, the city "is home to the 'Big Five' book publishers," including Plaintiffs Macmillan and Hachette, and "has the highest concentration of independent book publishers nationwide." Gould Decl. Ex. B at 11; Declaration of Andrew D. Jacobs ("Macmillan Decl.") ¶¶ 3–4; Declaration of Jennifer McArdle ("Hachette Decl.") ¶ 3–4. Plaintiff Elsevier, a leading publisher of journals and educational textbooks concerning the science, medical, and health sectors, has had its principal place of business in New York for over 85 years. Declaration of Paul Doda ("Elsevier Decl.") ¶¶ 2–3. Plaintiff McGraw Hill, a leading publisher of textbooks and educational content for students

and professionals, has maintained offices in New York for over a century. *See* Declaration of Steven Rosenthal ("McGraw Hill Decl.") ¶ 3. The Plaintiffs' presence here is not merely physical: New York City is an operational center for strategic, editorial, publishing, and commercial functions of their businesses. Elsevier Decl. ¶¶ 5, 8; Macmillan Decl. ¶¶ 4–5; Hachette Decl. ¶¶ 3–6, 8; McGraw Hill Decl. ¶¶ 3–4, 7.

New York City is also home to other key players in the publishing industry. Many authors and agents maintain a regular presence in the city. Compl. ¶ 29; Gould Decl. Ex. B at 11 (New York City's bookstores and book fairs are places "where writers congregate to network and exchange ideas"); *id.* at 54 ("freelancers have maintained a steady presence in [] NYC"). New York City also contains a significant number of Plaintiffs and the proposed class's customers; much of Plaintiffs' business, including purchases, subscriptions, and licensing, is transacted with individuals and entities residing in New York. Compl. ¶ 30; Macmillan Decl. ¶ 5; Hachette Decl. ¶ 6; McGraw Hill Decl. ¶ 4; *see also* Gould Decl. Ex. B at 62 (noting that New York City's book publishing industry employs more individuals than the next three benchmark cities combined).

Data on economic output of the publishing industry underscores the gravitational pull of this District. In a single year, "New York City's publishing industry generated $23.4 billion in direct economic output," which "represents sales to consumers and business-to-business spending within the industry." Gould Decl. Ex. B at 26. This economic activity spans initial "content ideation, development, production, marketing, and distribution of the final publishing form," a reflection of the concentration of decision-making authority here. *Id.* at 15; *see also* Compl. ¶ 29. In addition, this economic activity means that a substantial amount of the harm caused by Defendants' broad-scale infringement is felt here, in this District.

**B.      Meta's New York employees, offices, and resources were directly involved in the infringing activity at issue.**

Meta, one of the wealthiest and most valuable companies in the world with a market capitalization of roughly $1.5 trillion, has a significant presence in New York. Compl. ¶ 60; Gould Decl. Exs. C–D. Meta has maintained multiple offices within this District during the relevant period, including three current Manhattan offices. ECF 61 ("Jablonicky Decl.") ¶ 9. Meta employs approximately 7,708 employees in its Manhattan offices across the company's business, advertising, product development, and AI teams. *Id.*; Compl. ¶ 37. Zuckerberg is one of the wealthiest individuals in the world, has access to a private jet, and frequently travels to New York for work and personal events. Gould Decl. Exs. D–H.

New York is a key locale for the development of Meta's AI models. Zuckerberg and Meta founded the "Meta AI" internal division (its current name) in 2013, when Zuckerberg handpicked Dr. Yann LeCun to join the company's New York City offices as its Chief AI Scientist. Compl. ¶¶ 62–63; Gould Decl. Ex. I. Zuckerberg "put together the team that develops Llama, often reaching out personally to recruits," including many in New York. Compl. ¶ 63; Gould Decl. Ex. I. Senior New York employees include Meta's Senior Manager of the Llama LLM Research Team, Research Engineering Lead for North America for Meta's Core Machine Learning and Responsible AI, Associate General Counsel for AI, and an executive responsible for Business Development of AI Partnerships. Compl. ¶¶ 32–33; Gould Decl. Exs. J–Q. More than 46 legal, engineering, infrastructure, content, and management staff are actively engaged in developing, implementing, and promoting Meta's AI technology at issue in New York. Compl. ¶ 32; Gould Decl. Exs. T–W. As of February 2026, Meta listed over 290 open positions for its New York City offices, including 45 AI-related positions. Compl. ¶ 32; Gould Decl. Exs. R–S.

During the relevant period of AI development and training, Meta relied heavily on its

6

New York City offices and employees. Compl. ¶ 33. Among other functions, these New York-based employees pushed for, implemented, and helped conceal Meta's decisions to torrent from pirate collections and train Llama on stolen works. *Id.* ¶ 33; *see also id.* ¶¶ 15, 93, 132. For example:

- Meta's New York-based Senior Staff Research Engineer, Stephen Roller, torrented LibGen. Compl. ¶ 101; *Kadrey,* ECF 749. Mr. Roller is no longer a Meta employee. According to Meta's supporting declaration, he is based in New York City. Morton Decl., Ex. 8 (ECF No. 62-8).

- In April 2023, Melanie Kambadur, a Senior Manager of the Llama LLM Research team based in New York, explained "that it was 'really important for [Meta] to get books ASAP' to train Llama," Compl. ¶ 69; *Kadrey* ECF 567-28; Gould Decl. Ex. K. She also admitted internally, "to be honest, sometimes we do move the copyright text [such as a copyright notice]"—a DMCA violation. Compl. ¶ 75; *Kadrey*, ECF 567-25.

- Alex Presani, the New York-based Program Manager for Responsible AI stated in October 2022 that "LibGen and SciHub . . . are illegal pirated websites" and that "using pirated material should be beyond our ethical threshold," but Meta did it anyway. Compl. ¶ 69; *Kadrey*, ECF 567-21. Dr. Presani is no longer a Meta employee. According to Meta's supporting declaration, he is based in New York. Morton Decl., Ex. 7.

- Todor Mihaylov, a New York-based Meta staff research scientist explained that "it would not be trivial to download libgen if everything is in torrents," yet Meta did it anyway. Compl. ¶ 100; *Kadrey*, ECF 567-42; Gould Decl. Ex. N.

- Sony Theakanath, the New York-based Head of Integrity Infrastructure, Compute & AI Enablement circulated a memo internally concerning the legal risks of using LibGen. Gould Decl. Ex. M. Mr. Theakanath confirmed that the decision to torrent copyrighted works from a notorious pirate site had been made only "[a]fter a prior escalation to MZ[.]" Compl. ¶ 40; *Kadrey* 567-45. The memo contains a section on "legal and policy risks and mitigation," attributed to two of Meta's New York-based counsel, Ahuva Goldstand and Olena Ripnick-O'Farrell. Gould Decl. Exs. O–P. The memo describes Libgen as "a dataset we know to be pirated" and states that "we would not disclose use of Libgen datasets used to train." Compl. ¶ 101; *Kadrey* 567-45. This memo identified the risk that "[i]f there is media coverage suggesting we have used a dataset we know to be pirated, such as LibGen, this may undermine our negotiating position with regulators." Compl. ¶ 117; *Kadrey* 567-45. Meta did it anyway.

- Amanda Kallet, a New York area-based employee in Business Development, AI Partnerships described "how content from scientific and medical journal publishers is "something we've heard from the Llama team [] that is needed." Compl. ¶ 69; *Kadrey,* ECF 567-11; Gould Decl. Ex. L.

- Christian Montez, a New York-based Product Risk Program Manager for Generative AI noted in an "IP Policy Analysis" that "[a]s IP Policy has previously noted with respect to GenAI training on content from sites such as LibGen that contain pirated content, policymakers will take a negative view of such sites and their use (irrespective of any legal concerns)[.]" Compl. ¶ 101; *Kadrey*, ECF 654-15. Meta trained on that pirated content anyway. Mr. Montez is no longer a Meta employee, but his LinkedIn profile shows he is still based in New York. Gould Decl. Ex. Q.

These New York-based individuals are likely to be key witnesses on core issues to this case, including Defendants' illegal torrenting and reproduction of Plaintiffs' works to train Meta's LLMs, as well as Zuckerberg's knowledge and Defendants' willfulness.

New York City is also a center of Meta's marketing and promotion of Defendants' infringing AI technology. Compl. ¶ 37; Gould Decl. Exs. CC–HH. Meta promotes and advertises its AI products and services here, including through its dynamic, interactive website (meta.ai and associated subpages) and mobile applications (Meta AI, Instagram, Facebook, Messenger, and WhatsApp, all of which have Llama integrations). Compl. ¶ 34; Gould Decl. Ex. AA. Meta targets customers in New York and this District with promotional material tailored to a New York audience, including online and physical advertising of Meta's AI products and services on billboards in Times Square. Compl. ¶ 34; Gould Decl. Exs. EE–HH.

Meta also regularly hosts physical events in this District relating to Llama and other AI models, such as AI workshops. *Id.* ¶ 35; Gould Decl. Ex. CC (2025 Meta co-sponsored "Llama 4 Hackathon NYC" event, advertising that "Meta's Llama team will be in attendance, and hackers will receive hands-on support from the Meta team"); Ex. BB (advertising three Meta-hosted "AI Research Community" workshops in 2024 in New York City). And since November 2025, a "Meta Lab pop up" store in New York City has encouraged customers to "discover immersive demos, limited editions and custom details *only in store*." Gould Decl. Ex. DD.

II.     **This case is not the same as *Kadrey* or other lawsuits against Meta in California.**

Meta significantly overstates any parallels between this case and the cases pending in California, especially *Kadrey*.[2] *Kadrey* already has been litigated through discovery and one round of summary judgment on a subset of the individual plaintiffs' claims—nearly all of which were dismissed because those "plaintiffs made the wrong arguments and failed to develop a record in support of the right one." *Kadrey*, 788 F. Supp. 3d at 1036–37. The only claims remaining in *Kadrey* are for distribution during torrenting and contributory infringement based on Meta's torrenting. *Kadrey*, ECF 700. Only the distribution claim overlaps with any of the six claims in this case.

*Kadrey* also is not a certified class action. It is proceeding as an individual action at least through an additional round of summary judgment expected sometime in 2027. And even if a class is certified at some point, the class claims would not cover five of the six claims here or any claims against Zuckerberg, who is not named in *Kadrey*.

The other cases Meta cites are individual actions in their infancies.[3]

**LEGAL STANDARD**

"A district court may exercise its discretion to transfer venue 'for the convenience of

---

[2] The other cases Meta points to in California are all individual actions. *Entrepreneur Media, LLC v. Meta Platforms, Inc.*, No. 3:25-cv-09579-VC (N.D. Cal. Nov. 6, 2025); *Carreyrou et al. v. Meta Platforms, Inc.*, No. 3:26-cv-3725-VC (N.D. Cal. Dec. 22, 2025); *Chicken Soup for the Soul, LLC v. Meta Platforms, Inc.*, No. 3:26-cv-2333-VC (N.D. Cal. Mar. 17, 2026); *Cognella, Inc. v. Meta Platforms, Inc.*, No. 3:26-cv-4053-VC (N.D. Cal. May 4, 2026).

[3] On July 2, 2026, the same counsel and textbook author who moved to intervene in this case, ECF 56 (denying motion to intervene as premature), filed a putative class action against Meta in California limited to textbook authors. *See Sullivan v. Meta Platforms, Inc.*, No. 4:26-cv-06793-KAW, ECF 1 (N.D. Cal. July 2, 2026). The case does not include any publishers, nor authors of trade works or journals. Under the circumstances, this later-filed case should have no bearing on the transfer analysis.

parties and witnesses, in the interest of justice.'" *New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (quoting 28 U.S.C. § 1404(a)). Transfer under § 1404(a) involves two inquiries. First, the court considers whether the action might have been brought in the proposed venue. 28 U.S.C. § 1404(a); *Interparfums Luxury Brands, Inc. v. Gabet*, No. 23-cv-6269 (PKC), 2024 WL 1116879, at *3 (S.D.N.Y. Mar. 13, 2024) (Castel, J.).[4] If so, the court then determines whether the "the convenience of parties and witnesses" and "the interest of justice" justify transfer. 28 U.S.C. § 1404(a); *New York Marine*, 599 F.3d at 112.

The "party requesting transfer carries the 'burden of making out a strong case for transfer'" by "clear and convincing evidence." *New York Marine*, 599 F.3d at 114 (quoting *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 521 (2d Cir. 1989)). "When deciding a motion to transfer venue, the court must accept as true all of plaintiff's well-pleaded facts in the complaint, unless they are contradicted by affidavits or other appropriate evidence from the defendant." *Tianhai Lace USA Inc. v. Forever 21, Inc.*, No. 16-cv-5950, 2017 WL 4712632, at *2 (S.D.N.Y. Sept. 27, 2017) (citation omitted); *see also Kimble v. Opteon Appraisal, Inc.*, No. 23-cv-6399-FPG-MJP, 2025 WL 1509996, at *3 (W.D.N.Y. May 28, 2025) ("[I]n fact, parties seeking transfer are *required* to provide that material.") (original emphasis).

Courts weigh several factors in assessing whether a movant has met its burden, including "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of the parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties." *New York Marine*, 599 F.3d at

---

[4] Plaintiffs do not dispute that this action could have been brought in the Northern District of California.

112. "Other factors that are often considered are the (1) the forum's familiarity with the governing law, and (2) trial efficiency and the interests of justice, based on the totality of the circumstances." *Interparfums*, 2024 WL 1116879, at *4 (quotation omitted).

District courts enjoy broad discretion when assessing transfer requests, and "notions of convenience and fairness are considered on a case-by-case basis." *United States v. New York*, No. 25-cv-3656 (PKC), 2025 WL 2208941, at *2 (S.D.N.Y. Aug. 4, 2025) (Castel, J.) (quoting *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006)).

## ARGUMENT

**I.  The "first-filed rule" does not supersede Meta's burden to show, by clear and convincing evidence, that convenience strongly favors transfer under § 1404(a).**

Meta overstates the first-filed rule and attempts to shift the burden to Plaintiffs to justify litigating in their chosen forum. Second Circuit law makes clear that the first-filed rule does not override other considerations in the transfer analysis. *See New York Marine*, 599 F.3d at 112–114. Nor does it relieve Meta of having to establish by clear and convincing evidence that transfer is warranted under 28 U.S.C. § 1404(a). *Id.* The proper inquiry is the familiar, discretionary analysis under § 1404(a), in which the Court weighs convenience, fairness, and the interests of justice based on the full record. *Id*.

The Second Circuit's decision in *New York Marine* is instructive—and binding. There, the court considered the standard for transfer when several overlapping actions "of substantial magnitude and complexity" had been previously filed elsewhere. 599 F.3d at 109. Notwithstanding the earlier filed cases, the court confirmed the movant's "burden of making out a strong case for transfer" by "clear and convincing evidence." *Id.* at 112–14 (citation omitted). In affirming the district court's denial of transfer, the court clarified that even under those circumstances the balance-of-convenience factors "compose the 'centrality' of adjudicating

11

transfer motions." *Id.* at 113.

Consistent with this precedent, this Court has noted that the first-filed rule is not an "invariable mandate." *New York*, 2025 WL 2208941, at *2 (quoting *Emp'rs Ins of Wausau v. Fox Entm't Group, Inc.*, 522 F.3d 271, 275 (2d. Cir. 2008)). It "does not supersede the inquiry into the balance of convenience under § 1404(a)." *MK Sys., Inc. v. Schmidt*, No. 04-cv-8106 (RWS), 2005 WL 590665, at *3 (S.D.N.Y. Mar. 10, 2005) (citation omitted) (analyzing first-filed rule under "trial efficiency and interests of justice" factor). Rather, it is "one among several factors in the overall calculus of efficiency and the interests of justice." *Am. Steamship Owners Mut. Prot. & Indem. Ass'n v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d 474 (S.D.N.Y. 2007).[5]

Even setting aside these principles, the first-filed rule merits little weight here. The purpose of the first-file rule is "to avoid duplicative litigation and honor the plaintiff's choice of forum." *New York*, 2025 WL 2208941 at *2 (internal quotes omitted). Transferring this case would not serve this purpose. This case does not prejudice the *Kadrey* plaintiffs' right to litigate in their chosen forum. And the minimal overlap between the claims in the two cases renders any efficiencies to be achieved through transfer negligible.

This case asserts, on a class-wide basis, that Meta infringed by reproducing copyrighted works through downloading (by torrenting) from pirate sites, downloading unauthorized web scrapes, copying those works to train Llama, and stripping copyright management information from them to conceal its infringement.

In *Kadrey*, the district court resolved comparable claims on an individual basis for the 13

---

[5] Contrary to Meta's suggestion, the balance-of-convenience factors do not need to "overwhelmingly support litigation" in this district. Mot. at 8. Meta cites only one district court case using that quoted phrase, which conflicts with the binding Second Circuit law described above. *See New York Marine*, 599 F.3d at 112.

12

author-plaintiffs, "not the countless others whose works Meta used to train its models," 788 F. Supp. 3d at 1036.[6] The *Kadrey* court explained that its "ruling does not stand for the proposition that Meta's use of copyrighted materials to train its language models is lawful. It stands only for the proposition that these plaintiffs made the wrong arguments and failed to develop a record in support of the right one." *Id.* at 1036–37. The court further emphasized that its "favorable ruling for the defendant binds only the individual named plaintiffs, leaving all other members of the proposed class free to sue on the same claims." *Id.* at 1043.

The sole remaining claim in *Kadrey* that overlaps with this case is an ordinary distribution claim; it does not involve the issues at the heart of Plaintiffs' complaint—namely, whether an AI developer may illegally obtain, and then further copy, copyrighted materials to train its AI models without permission, all in the face of a growing licensing market. On these facts, that *Kadrey* was "filed first" should have little impact on where *this case* should proceed.

The non-*Kadrey* cases Meta cites fare no better. The transfer of *Huckabee v. Meta Platforms, Inc.* to California bears no weight. The *Huckabee* plaintiffs *stipulated* to severance and transfer. *See* No. 23-cv-09152-LGS, ECF 69 (S.D.N.Y. Dec. 28, 2023). That case also lacked the significant ties to this District present here and had no New York-based plaintiffs.

Nor do the four other California cases on which Meta relies justify transfer under the first-filed rule. A general "lack of progress" in earlier-filed litigation supports "the exercise of the Court's discretion in rejecting the first-filed rule." *In re Arb. between Griffin Indus., Inc. & Petrojam, Ltd.*, 58 F. Supp. 2d 212, 218 (S.D.N.Y. 1999) (citing cases). Filed between November 2025 and May 2026, *see supra*, n. 2, none of those cases is outside the initial stages of discovery

---

[6] The *Kadrey* court long ago dismissed a slew of state law claims, including negligence, unjust enrichment, and unfair competition as "nonsensical" or "preempted." *Kadrey*, ECF 56, 471. And the *Kadrey* case has never involved claims against Zuckerberg.

or otherwise shows substantial progress. And none is pled as a class action, meaning any holdings in those cases will not bind Plaintiffs or putative class members in this case.

Even crediting Meta's overdependence on the first-filed rule (which the Court should not do), Meta acknowledges two exceptions where it does not apply. *See* Mot. at 8. As outlined below, both exceptions apply here because the balance of convenience favors this action and special circumstances warrant giving this case priority.

## II.    The balance of convenience weighs decidedly in favor of this District.

Meta fails to establish by clear and convincing evidence that the balance-of-convenience factors favor transfer. All factors favor this District or are neutral, and Meta supplies no concrete justification to override Plaintiffs' choice of forum.

### A.    Plaintiffs' choice of forum is entitled to substantial deference.

"[P]laintiff's choice of forum is entitled considerable weight, and should not be disturbed unless the balance of the several factors is strongly in favor of the defendant." *Dow Jones & Co. Inc. v. Perplexity AI, Inc.*, 797 F. Supp. 3d 305, 336 (S.D.N.Y. 2025) (cleaned up) (denying motion to transfer to N.D. Cal. filed by San Francisco-based AI company). "This is especially true where the chosen forum is also the plaintiff's home state." *Id.* (cleaned up); *see also New York*, 2025 WL 2208941, at *4 (denying transfer and explaining: "[w]here the balance of other factors does not tip decidedly in one direction, a plaintiff's selection of a forum is entitled to considerable deference"); *Interparfums*, 2024 WL 1116879, at *4 (denying transfer and noting plaintiff's decision "to file suit in federal court in New York, where it is headquartered, is entitled to deference").

Even in a class action, a plaintiff's choice of venue should "be honored unless defendants make a 'convincing showing' that venue should be changed." *In re Geopharma, Inc.*, No. 04-cv-9463 (SAS), 2005 WL 1123883, at *1 (S.D.N.Y. May 11, 2005) (denying transfer); *see also In*

14

*re Warrick*, 70 F.3d 736, 741 n.7 (2d Cir. 1995) (observing that a class representative's choice of venue is still "entitled to substantial consideration"); *In re Bystolic Antitrust Litig.*, No. 20-cv-5735 (LJL), 2021 WL 148747, at *3 (S.D.N.Y. Jan. 15, 2021) (denying transfer and according plaintiff's choice of forum weight as "it is relevant that many of the class members reside in New York").

New York City has been the center of the American publishing industry for more than two centuries. Gould Decl. Ex. A. Plaintiffs Macmillan and Hachette are headquartered here, along with many class members and "hundreds of smaller presses, renowned literary agents, a vigorous arts scene, and an uncountable number of aspiring and established writers alike." *Id.*; Macmillan Decl. ¶¶ 3–4; Hachette Decl. ¶ 4; *see also* Compl. ¶ 29. New York City has been a central base for McGraw Hill's publishing, editorial, and commercial operations for over a century, McGraw Hill Decl. ¶ 3, and played a central role in Elsevier's journal publishing business for more than 80 years. Elsevier Decl. ¶¶ 4–5. Editorial acquisitions, contract negotiations, marketing, and rights management are largely conducted in this District, significant numbers of the publisher plaintiffs' customers are located here, and the harm from Meta's infringement will be substantially felt in this District. Compl. ¶¶ 29–30; Elsevier Decl. ¶¶ 5, 8; Macmillan Decl. ¶¶ 4–5; Hachette Decl. ¶¶ 3–6, 8; McGraw Hill Decl. ¶¶ 3–4, 7; *see also* Gould Decl. Ex. B at 26 (documenting the tens of billions of dollars New York City's publishing industry generates annually); *id.* at 31 (noting New York City is the largest employer of publishing professionals by several orders of magnitude).[7]

---

[7] Meta's reliance on *Erickson v. Corinthian Colleges, Inc.* to diminish the weight of this factor is misplaced. *See* Mot. at 15 (citing No. 13-cv-4308-PKC, 2013 WL 5493162 (S.D.N.Y. Oct. 1, 2013)). Plaintiff Erickson's choice of forum was "tactical," the case had only "minimal connections" to this District, and plaintiff filed here only after his identical claims were dismissed from the transferee forum for failure to state a claim. *Id.* at *3.

**B.** **The remaining convenience factors favor Plaintiffs or are neutral.**

1. <u>Because no identified witnesses would be inconvenienced by proceeding in this District, this factor favors this District.</u>

"When a party seeks the transfer on account of the convenience of witnesses under § 1404(a), he must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover." *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir. 1978). "Absent such showing, the motion should be denied." *Ed. Musical Latino Americana, S.A. v. Mar Int'l Recs., Inc.*, 829 F. Supp. 62, 66–67 (S.D.N.Y. 1993). Defendants make no such showing here and may not do so for the first time on reply. *See Day Vill. Ltd. P'ship v. CW Cap. L.L.C.*, No. 06-cv-3424(LTS)(HBP), 2006 WL 2572118, at *3 (S.D.N.Y. Sept. 7, 2006) ("Here, Defendant failed to include the requisite factual information in its moving papers. While Defendant has proffered such an affidavit in its reply papers, the Court will not consider this affidavit as arguments cannot be made for the first time in reply papers.").

*Meta's cursory list of current employees falls far short of demonstrating that witness convenience favors transfer.* As a threshold matter, employees "cannot be considered in the convenience analysis 'since [they] will . . . be available in any venue by virtue of the employment relationship.'" *See Bennett v. Sterling Planet, Inc.*, No. 09-cv-1176 (GLS/DRH), 2010 WL 11566003, at *6 (N.D.N.Y. Mar. 22, 2010) (denying transfer and explaining that defendant "would [not] suffer any oppressive or unusual expense or inconvenience in transporting its own employees to New York, where it does business" (internal citation omitted)). This is particularly true where the defendant conducts business in the plaintiff's chosen forum. *See Scalia v. KDE Equine, LLC*, No. 19-cv-3389 (KAM) (SJB), 2020 WL 4336395, at *5 (E.D.N.Y. July 28, 2020) (finding defendants' argument that "their own employees would be inconvenienced by having to travel to New York" unpersuasive where

16

"[d]efendants [we]re clearly engaged in substantial business operations in New York").

Meta is a $1.5 trillion enterprise with bicoastal AI-operations and employees who can readily serve as witnesses in New York. Meta maintains three Manhattan offices with more than 7,700 employees, including multiple who develop, implement, and promote Meta's AI technology. Compl. ¶¶ 32–37; Jablonicky Decl. ¶ 9; Gould Decl. Exs. K–W. The location of Meta's party witnesses should not factor into, let alone sway, the transfer analysis, as other courts have ruled in denying Meta's transfer requests. *See Mirror Worlds Techs., LLC v. Facebook, Inc.*, No. 17-cv-3473 (JGK), 2017 WL 5634127, at *5 (S.D.N.Y. Nov. 20, 2017) (noting that "courts in this District have routinely rejected arguments by large, multinational corporations that a case should be transferred to the District where most of the corporate employees are located," and finding that "Facebook is more than capable of transporting its Menlo Park employees to this District in the event that Facebook sought to call them to testify at trial."); *EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342, 350–52 (E.D.N.Y. 2012); *Car-Freshner Corp. v. Meta Platforms, Inc.*, No. 22-cv-1305 (MAD/ML), 2023 WL 7325109, at *19 (N.D.N.Y. Nov. 7, 2023).

Meta also fails to explain why its out-of-district employees' testimony is material. "Generally, the moving party submits an affidavit . . . which includes the potential principal witnesses expected to be called *and the substance of their testimony*." *EasyWeb v. Facebook.*, 888 F. Supp. 2d at 350–52  (denying transfer where Facebook provided a list of individuals without clarifying which witnesses it intended to call or describing "the materiality of their testimony") (emphasis added)); *see also Chanel, Inc. v. Shiver & Duke LLC*, No. 1:21-cv-01277 (MKV), 2022 WL 3868113, at *4 (S.D.N.Y. Aug. 30, 2022) (denying transfer where defendants failed to provide any "information about [] potential witnesses or the *importance of their testimony*"). Meta's laundry list of current employees omits the necessary information about the

17

substance, materiality, or importance of anticipated testimony needed for the Court to assess Meta's claim of inconvenience.

Meta's argument about employee inconvenience is also undermined by the inconvenience that transfer would cause Plaintiffs' witnesses. "Where transfer would merely shift the inconvenience from one party to the other, the Court should leave plaintiff's choice of venue undisturbed." *EasyWeb v. Facebook*, 888 F. Supp. 2d at 352 (denying transfer from New York to California and declining to shift the inconvenience from Facebook's party witnesses to plaintiff's party witnesses); *see also Mirror Worlds v. Facebook.*, 2017 WL 5634127, at *5 (same). That is precisely what transfer would do here.

Plaintiffs have extensive ties to New York, and many of Plaintiffs' witnesses are located in the New York area. Elsevier Decl. ¶¶ 4–5, 8–10; Macmillan Decl. ¶¶ 4–7; Hachette Decl. ¶¶ 3–6, 8–9; McGraw Hill Decl. ¶¶ 3–4, 7–8. Although it is Meta's burden to produce evidence of inconvenience, Plaintiffs have nevertheless identified key New York witnesses and their anticipated testimony.[8] Plaintiffs plan to rely on New York-based witnesses to testify about key topics including ownership and registration of copyrights; the publishing industry; the creation, dissemination, and protection of literary works; harm from Meta's infringement; the need to deter piracy; and AI licensing and products. Elsevier Decl. ¶¶ 8–10; Macmillan Decl. ¶¶ 6–7; Hachette Decl. ¶¶ 8–9; McGraw Hill Decl. ¶¶ 7–8. *See also Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 696 (S.D.N.Y. 2009) (Plaintiffs "will undoubtedly want to

---

[8] *E.g.*, *Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*, No. 22-cv-2538 (LJL), 2022 WL 17067984, at *7 (S.D.N.Y. Nov. 17, 2022) ("Plaintiff need not identify witnesses for whom New York is a more convenient forum"); *IKB Int'l S.A. v. Wilmington Tr. Co.*, No. 16-CV-4917 (RA), 2017 WL 4084052, at *4 (S.D.N.Y. Sept. 14, 2017) ("The party resisting transfer, in this case, Plaintiffs, do not need to make the same showing of specific witnesses or their locations as Defendant . . .").

call witnesses to attest to, *inter alia*, their ownership of the copyrights, the alleged infringement, and the adverse impact that infringement has had on plaintiffs' business."). Transferring this litigation to California would inconvenience Plaintiffs' many New York-based witnesses who will provide testimony on these important topics.

***Meta's list of potential non-party witnesses similarly fails to support transfer.*** Meta again fails to describe the substance of any testimony its potential non-party witnesses will provide, *see* Mot. at 17 and Jablonicky Decl. ¶ 12, preventing the Court from evaluating the importance of their testimony. The Court should disregard Meta's suggestion that it may call non-party witnesses based in California. *See Winstron Neweb Corp.*, 2022 WL 17067984, at *6 (finding witness convenience did not favor transfer where the movant merely listed nonparty witness' names and titles without explaining the materiality of their testimony or why they would be inconvenienced by the transfer).

Meta's suggestion that its non-party witnesses are outside the subpoena power of this Court, *see* Mot at 17, is equally unavailing, because Meta does not provide any evidence that such witnesses would refuse to appear in this District. *See Marotto v. Kellogg Co., et al.*, No. 18-cv-3545 (AKH), 2018 WL 10667923, at *6 (S.D.N.Y. Nov. 29, 2018) ("Where there is no indication that a witness will "fail to testify without compulsion . . . this factor is neutral with respect to the question of transfer."). In any event, "[f]ormer employees are not entitled to the same deference shown to other non-party witnesses because they are more likely willing to attend trial than other non-party witnesses." *Pilevesky v. Suntrust Bank*, No. 10-cv-2290 (JS) (ETB), 2010 WL 4879006, at *3 (E.D.N.Y. Nov. 22, 2010).

Meta also ignores that both parties are likely to call multiple New York-based non-party witnesses—who would be outside of the subpoena power of the Northern District of California.

Indeed, in *Kadrey*, Meta served subpoenas on numerous New York-based publishers, including at least HarperCollins, Penguin Random House, and Broadway Licensing, (as well as Plaintiffs Hachette and Macmillan). *Kadrey*, ECF 654-20.

***Finally, that some "current employee document custodians in the Kadrey and/or Entrepreneur matters . . . are based in N.D. Cal.," is irrelevant and does not weigh in Meta's favor.*** Meta does not explain why California-based document custodians would be inconvenienced by proceedings in New York. Mot. at 16–17. Indeed, in this era of e-discovery, document custodians are not inconvenienced by producing documents electronically in a litigation based outside their home jurisdiction.

This factor decidedly favors Plaintiffs and Meta fails to make any relevant showing to suggest otherwise.

2. <u>Because transfer would merely shift inconvenience to Plaintiffs, convenience of the parties favors this District.</u>

In weighing the convenience of the parties, courts look at the relative means of the plaintiff and defendant. *Interparfums*, 2024 WL 1116879, at *6 (noting this factor has "little or no significance absent showing of disparity of means" between the parties). To the extent there is any such disparity here, it favors Plaintiffs.

Meta and Zuckerberg are among the wealthiest companies and individuals in the world. Meta maintains significant operations here. Zuckerberg has access to a private jet and frequently travels to New York for personal and work events. Gould Decl. Exs. E–H; *see Manchin v. PACS Grp., Inc.*, No. 24-cv-8636 (LJL), 2025 WL 1276569, at *12 (S.D.N.Y. May 1, 2025) (noting that executives who "travel to New York for business and own private jets" face minimal disruption). It is no inconvenience for Defendants of this size and these resources to litigate here.

On the other hand, transfer would pose a greater inconvenience to Plaintiffs. Plaintiffs

Hachette and Macmillan are headquartered in New York, and other Plaintiffs have a significant presence here. Elsevier Decl. ¶¶ 4–7; Macmillan Decl. ¶¶ 3–5; Hachette Decl. ¶¶ 3–7; McGraw Hill Decl. ¶¶ 3–6; *see also Freeplay Music LLC v. Gibson Brands, Inc.*, 195 F. Supp. 3d 613, 618 (S.D.N.Y. 2016) (finding convenience of parties weighed against transfer where plaintiff's principal place of business was in New York and defendant was registered to do business there).[9]

Meta's argument that Plaintiffs have sufficient resources to litigate in California falls flat. Mot. at 20–21. Meta's revenues dwarf those of Plaintiffs' revenues combined, and Meta is better positioned to absorb any litigation-related travel expense. Transfer from Plaintiffs' chosen venue is not justified where it would, at best, "merely shift the inconvenience from one party to the other." *Calabrese v. Teoco Corp.*, 637 F. Supp. 2d 160, 163 (S.D.N.Y. 2009).

3.  <u>Because New York is a locus of operative facts, this factor favors this District.</u>

That some relevant events may have occurred in the Northern District of California does not shift the balance to that district. A case may have "several loci of operative facts." *Atlantic Recording Corp.*, 603 F. Supp. 2d at 697 (noting infringing product was developed in California, and New York was another locus as website received funding from New York investment company and generated revenue by selling advertising to New York companies through a New York ad agency). Even if California is *a* locus of operative facts for this case, the Southern District of New York is too.

Key Meta employees who oversaw the development and training of Llama were based in

---

[9] Meta's reliance on Cengage and Hachette's motion to intervene in *In re Google Generative AI Copyright Litig.*, No. 5:23-cv-03440-EKL (N.D. Cal.) is misplaced. *See* Mot. at 20–21. By definition, Cengage and Hachette could not file a motion to *intervene* in New York when the *Google* case is pending in California. In any event, months have passed without resolution of that motion and with the clock running on certain claims, Cengage and Hachette recently withdrew their motion and filed a class action against Google in this District. *Hachette Book Group, Inc. et al. v. Google LLC*, No. 26-cv-5870 (S.D.N.Y. July 10, 2026).

Meta's New York City offices during the relevant period, including Meta's Chief AI Scientist; Senior Manager of the Llama LLM Research Team; Head of Integrity Infrastructure, Compute & AI Enablement; Program Manager for Responsible AI; Product Risk Program Manager for Generative AI; a Business Development executive for AI Partnerships, and senior staff research scientists and engineers. *Supra*, p. 5.

Meta reached out to McGraw Hill's New York employees about licensing their copyrighted works to train Llama, as well as to other members of the putative class. *See* McGraw Hill Decl. ¶ 6; Compl. ¶¶ 82, 93, 132. Meta's New York employees pushed for, implemented, and helped conceal Meta's decisions to torrent from pirate collections and train Llama on stolen works. *Id.* ¶ 33. Meta offers its AI services and advertises extensively in this District. *Id.* ¶ 34. And the publishing industry's extensive ties to New York City mean that harm to Plaintiffs and the market for their works is disproportionately felt in this District. *See id.* ¶ 29. Given these clear ties to New York and this District, this factor is at most neutral and does not support transfer. *See Atlantic Recording Corp.*, 603 F. Supp. 2d at 69 (denying transfer where both California and New York were locus of operative events); *Interparfums*, 2024 WL 1116879 at *5 (denying transfer and finding "[t]here are several loci of operative facts," including "Paris, New York, and Indiana").

Meta's attempts to downplay this case's New York connections do not change this outcome. For example, Meta's New York-based Head of Integrity Infrastructure, Compute & AI Enablement, drafted and circulated a key internal memo setting forth Meta's rationale for torrenting. Compl. ¶¶ 101, 117; *supra,* Background Section II. Rather than dispute this (because it cannot), Meta claims that Plaintiffs are speculating about his relevance because he was not a document custodian or deponent in *Kadrey*. Mot. at 20 n.7. But this ignores the *Kadrey* court's

22

assessment that the record developed in *Kadrey* was inadequate, *see Kadrey*, 788 F. Supp. 3d at 1036–37; and that Plaintiffs intend to pursue additional discovery.

        4.   Trial efficiency and interests of justice are neutral or slightly favor this District.

Because the actions pending in California have limited overlap with this action, the purported efficiencies to be gained from transfer are similarly limited. By contrast, interests of justice heavily favor allowing multiple courts to address the important and novel questions of AI and copyright law raised by Plaintiffs' Complaint.

***Meta overstates the alleged overlap with Kadrey and other California cases.*** For all the reasons alleged in Section I, material differences outweigh any similarities with the existing California cases such that transfer will not promote efficiency. *See supra*, Argument Section I.

***The Kadrey court's rulings were expressly limited to that case's record and do not bind Plaintiffs here.*** In *Kadrey*, the court ruled that much of Meta's alleged conduct in that case was protected by fair use. *See* 788 F. Supp. 3d at 1060. But the court was careful to limit its ruling to the individual plaintiffs and facts of that case. On the "question whether such conduct is illegal[, a]lthough the devil is in the details, in most cases the answer will likely be yes." *Id.* at 1034. Judge Chhabria elaborated:

> In cases involving uses like Meta's, it seems like the plaintiffs will often win, at least where those cases have better-developed records on the market effects of the defendant's use. No matter how transformative LLM training may be, it's hard to imagine that it can be fair use to use copyrighted books to develop a tool to make billions or trillions of dollars while enabling the creation of a potentially endless stream of competing works that could significantly harm the market for those books. . . .
>
> [T]o stave off summary judgment, [plaintiffs] needed to create a genuine issue of material fact as to [the fair use market harm] factor. … [H]ad the plaintiffs presented any evidence that a jury could use to find in their favor on the issue, factor four would have needed to go to a jury. Or perhaps the plaintiffs could even have made a strong enough showing to win on the fair use issue at summary judgment.

*Id.* at 1059–60; *see also Kadrey*, Case Mgmt. Conf. Tr. 19:22–33, July 1, 2026 ("I don't think we

23

can assume the *Kadrey* plaintiffs asked the right questions" in depositions). Plaintiffs intend to build a more complete record here.

**The status of the Kadrey case undermines Meta's transfer motion.**  Meta's transfer request is designed to relegate viable claims in this case to *Kadrey*'s shadow. Transfer would lump Plaintiffs' claims in with a case where Meta already has prevailed, in part, on fair use based on a record the court found lacking and that only bound those individual author plaintiffs. The efficiencies Meta suggests, if any, would be limited to a single, unresolved distribution claim untethered to Meta's AI products and services. Practically speaking, Meta seeks broad centralization of AI-copyright litigation through ordinary transfer motions, without the procedural safeguards of established multidistrict litigation.[10]

**The public interest strongly favors keeping this case in this District.**  Even if Meta could establish by clear and convincing evidence that transfer will promote efficiency (which it cannot), courts recognize that although transfer "may produce some efficiency gains, efficiency is not the sole consideration." *Marotto*, 2018 WL 10667923, at *6–7 (denying transfer to California and finding trial efficiency and interests of justice did not favor transfer even when a first-filed California case was "relatively advanced" and there were "close factual similarities between the [SDNY and California] cases"); *see also Interparfums*, 2024 WL 1116879, at *6 (denying transfer and finding that trial efficiency and interests of justice "weigh[] strongly against transferring" where the first-filed case was in discovery and had no trial date set).

Here, considerations beyond efficiency are substantial, as the public will benefit from

---

[10] Meta makes much of the fact that the five California cases were deemed related. Mot. at 5. Because that procedural step was unopposed in each instance, it bears little weight.

multiple courts considering and ruling on the issues raised by this case.[11] This case asks whether AI developers may illegally obtain, and then further copy, copyrighted materials to train their AI models without permission—all to the detriment of a growing licensing market. Few courts have reached merits rulings on these questions, and no court has resolved them on the distinct record or theories of liability that Plaintiffs intend to develop here. Given the importance of the issues, the interests of justice weigh heavily against transferring these novel and important issues. As another court in this District has explained:

> [T]he efficiency gains of transfer are offset by the loss of inter-court dialogue that would result from having one court, and one circuit, decide a matter of national importance. It is a bedrock principle of our federal court system that the adjudication of novel and difficult issues of law is best served by letting questions percolate among the lower federal courts, even at the cost of short-term disuniformity.

*New York v. Pruitt*, No. 18-cv-1030 (JPO), 2018 WL 2411595, at *4 (S.D.N.Y. May 29, 2018).

*See also New York*, 2025 WL 2208941, at *4 (denying transfer where actions "ultimately will be decided by the Second Circuit or the Supreme Court" and noting that by denying transfer "an appellate court may have the benefit of different judicial approaches and viewpoints").

    5.   The remaining factors are neutral.

"In an era of electronic documents, easy copying and overnight shipping," document location has minimal relevance. *ESPN, Inc. v. Quiksilver, Inc.*, 581 F. Supp. 2d 542, 548 (S.D.N.Y. 2008). Meta's reference to a *Kadrey* source code inspection at outside counsel's office in California does not change that. Source code, by its nature, is digital, and each of Meta's three retained law firms in this case has a New York office. *EasyWeb v. Facebook*, 888 F. Supp. 2d at 352 (location of Facebook's documents in California did not support transfer). Finally, both

---

[11] The public benefit and interests of justice served by diverse consideration of these important issues by multiple courts also satisfies the "special circumstances" exception to the first-filed rule that Meta advocates. Mot. at 8.

courts are equally capable of applying federal copyright law. *See Interparfums*, 2024 WL 1116879, at *6 (finding a case governed solely by federal law "does not favor transfer").

<u>**CONCLUSION**</u>

Meta cannot demonstrate, let alone by clear and convincing evidence, that the balance of factors strongly favors transfer. Accordingly, Plaintiffs respectfully request that the Court deny Meta's Motion.

Dated: July 13, 2026

Respectfully submitted,

/s/ *Jeffrey M. Gould*
Jeffrey M. Gould (*admitted pro hac vice*)
Matthew J. Oppenheim
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave, NW, 5th Floor
Washington, DC 20016
matt@oandzlaw.com
jeff@oandzlaw.com
Tel: 202.480.2999

Daryl L. Kleiman
Edward Crouse (*admitted pro hac vice*)
Eli Goldman (*admitted pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
491 Fifth Avenue, 19th Floor
New York, NY 10017
dkleiman@oandzlaw.com
ecrouse@oandzlaw.com
egoldman@oandzlaw.com
Tel: 212.951.1156

James J. Pastore
Megan K. Bannigan
Morgan A. Davis
Kathryn C. Saba
Abigail E. Liles
DEBEVOISE & PLIMPTON LLP
66 Hudson Blvd E,
New York, NY 10001
mkbannigan@debevoise.com
jjpastore@debevoise.com
mdavis@debevoise.com
ksaba@debevoise.com
aeliles@debevoise.com
Tel: 212.909.6000

Derek W. Loeser (*admitted pro hac vice*)
Benjamin Gould (*admitted pro hac vice*)
Chris N. Ryder (*admitted pro hac vice*)
Samuel L. Rubinstein (*admitted pro hac vice*)
KELLER ROHRBACK
1201 Third Avenue, Ste 3400
Seattle, WA 98101
dloeser@kellerrohrback.com
bgould@kellerrohrback.com
cryder@kellerrohrback.com
srubinstein@kellerrohrback.com
Tel: 206.623.1900

*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF WORD COUNT COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the foregoing is set in 12-point Times New Roman font and, according to the word processing program with which it was prepared, contains 8,503 words, excluding the case caption, table of contents, table of authorities, signature block, and required certificates.

/s/ Jeffrey M. Gould

Jeffrey M. Gould

*Counsel for Plaintiffs and the Proposed Class*

27